IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - - - x
THE UNITED STATES OF AMERICA,

                                    Criminal Action No.
            Plaintiff,              1:25-cr-00261-RBW-1
                                    Thursday, January 22, 2026
v.                                  3:13 p.m.

ANTWAIN DARRELL SIMPSON,

            Defendant.
- - - - - - - - - - - - - - - - x

_____

TRANSCRIPT OF EVIDENTIARY HEARING
HELD BEFORE THE HONORABLE REGGIE B. WALTON
UNITED STATES DISTRICT JUDGE
_____

APPEARANCES:

For the United States:      **BENJAMIN ADAM HELFAND, ESQ.**
                            **U.S. ATTORNEY'S OFFICE FOR D.C.**
                            601 D Street NW
                            Washington, DC 20053
                            (202) 252-7059
                            benjamin.helfand@usdoj.gov


For the Defendant:          **BRIAN KEITH MCDANIEL, ESQ.**
                            **MCDANIEL LAW GROUP, PLLC**
                            1001 L Street, SE
                            Washington, DC 20003
                            (202) 331-0793
                            bkmassociates@aol.com


Court Reporter:             Lisa A. Moreira, RDR, CRR
                            Official Court Reporter
                            U.S. Courthouse, Room 6718
                            333 Constitution Avenue, NW
                            Washington, DC  20001
                            (202) 354-3187

I N D E X

WITNESS                                                          PAGE

**MPD OFFICER MANUEL SIBRIAN**
     (By Mr. Helfand)....................................4
     (By Mr. McDaniel)...................................35

P R O C E E D I N G S

THE COURTROOM DEPUTY:  This is Criminal Matter 25-261, *United States of America v. Antwain Simpson*.

May I have counsel approach the lectern and state your appearance for the record beginning with the government.

MR. HELFAND:  Good afternoon, Your Honor; Benjamin Helfand for the United States.

THE COURT:  Good afternoon.

MR. McDANIEL:  Good afternoon, Your Honor.  May it please the Court.  Brian McDaniel on behalf of Mr. Simpson.  Mr. Simpson is present and seated at counsel's table.

THE COURT:  Good afternoon.

Okay.  The matter is here for a motion to suppress hearing.

How many witnesses will the government have?

MR. HELFAND:  Just one, Your Honor.

THE COURT:  And the defense, would you have any witnesses?

MR. McDANIEL:  No, Your Honor.

THE COURT:  Okay.

Government Counsel, you may call your first witness.

MR. HELFAND:  Thank you, Your Honor.

The government calls Officer Manuel Sibrian.

MPD OFFICER MANUEL SIBRIAN, Sworn

DIRECT EXAMINATION

BY MR. HELFAND:

Q.  Good afternoon.  Can you please introduce yourself by stating and spelling your name.

A.  My name is Officer Sibrian, S-I-B-R-I-A-N.  First name is Manuel, M-A-N-U-E-L.

Q.  What do you do for work, sir?

A.  I'm a police officer for the Metropolitan Police Department.

Q.  How long have you done that?

A.  Over eight years.

Q.  What's your current assignment with the Metropolitan Police Department?

A.  I'm currently assigned at the crime suppression in the Fifth District.

THE COURT:  In the Fifth District?

THE WITNESS:  Fifth District, correct.

Q.  What is the crime suppression team?

A.  The crime suppression team is a specialized unit for the Fifth District.

Q.  And when you say it's a specialized unit, what does it do?

A.  Yes, so we're trained to do special operations such as search warrants, arrest warrants, narcotics investigations,

illegal firearms investigations.  We also look into narcotics complaints from citizens and, you know, long-term investigations.

Q.  As part of your work with the crime suppression team and the Metropolitan Police Department, have you received any training in the characteristics of an individual who may have a firearm?

A.  Yes.  Part of the training to be part of the crime suppression unit is that class you just mentioned, which is Characteristics of Armed Individuals.

Q.  And what characteristics are you taught to look for?

A.  There are multiple, but they're mainly focused on body language and movements.

Q.  Such as...?

A.  Such as blading the body, looking away, moving in a certain way, walking in a certain way.

Q.  All right.  I'd like to take you to August 22nd of 2025. Were you working that day?

A.  Yes.

Q.  And specifically in the evening of August 22nd of 2025, were you working?

A.  Yes.

Q.  And were you assigned to patrol the 1400 block of Saratoga Avenue, Northeast, here in the District of Columbia?

A.   Yes.   That is part of the Fifth District.

Q.   Is that an area you frequently patrol?

A.   Yes.

Q.   Why?

A.   That is a violent crime area.   I have responded to numerous calls for service, and I have also participated in multiple arrests as well as long-term investigations.

Q.   Have you previously recovered illegal firearms in the 1400 block of Saratoga Avenue, Northeast?

            MR. McDANIEL:   Objection.

            THE COURT:   Basis?

            MR. McDANIEL:   Relevance, Your Honor.

            MR. HELFAND:   We submit it's relevant, Your Honor, given that the officer did recover a firearm in this particular block.

            THE COURT:   I'll overrule the objection.

Q.   If you could tell us whether you previously made an illegal firearm recovery in the block -- or recoveries in the 1400 block of Saratoga Avenue, Northeast?

A.   I have participated in numerous illegal firearm recoveries and arrests in the 1400 block of Saratoga Avenue.

Q.   Could you give us an approximate number?

A.   Over ten.

Q.   And have you previously made any recoveries of illegal drugs or narcotics in the 1400 block of Saratoga Avenue,

Northeast?

A.   I have been involved in multiple illegal narcotic transaction investigations as well as illegal narcotic arrests and recoveries in the 1400 block of Saratoga Avenue.

Q.   Can you give us an approximate number in terms of the number of arrests for the possession of illegal narcotics or distribution of illegal narcotics that you've made in that area?

A.   Over the years I've participated in over 25 arrests and recoveries of narcotics in the 1400 block of Saratoga Avenue.

Q.   Now, taking you back to the night of August 22nd of 2025, were you driving a marked police vehicle that evening?

A.   Yes.

Q.   And were you dressed in a police uniform?

A.   Yes.

Q.   And did that uniform clearly identify you as a police officer?

A.   Yes.

Q.   Were you the only person in the police vehicle you were in when you drove to the 1400 block of Saratoga Avenue, Northeast, on August 22nd?

A.   No.

Q.   Who else was in the car with you?

A.   Officer Harleston.

Q. Anyone else, to the best of your memory?

A. Not that I can recall.

Q. When you drove into the -- well, let me ask this.

Did you drive into the 1400 block of Saratoga Avenue, Northeast, on August 22nd?

A. Yes.

Q. What were you looking for when you drove into that part of the city, or paying attention to? Let me ask the question that way.

A. We were just patrolling the area, observing any kind of infraction, open containers of alcohol, illegal use of or smoking of marijuana in public spaces. Just patrolling the neighborhood.

Q. And did you observe any illegal activity?

A. Yes.

Q. What did you see?

A. I observed a group of individuals on my left side in the 1400 block of Saratoga. One of the first things that I noticed is that multiple individuals were seated in lawn chairs on the sidewalk impeding the free pathway of the sidewalk, the public sidewalk.

Q. And why was that of any relevance or significance to you?

A. Because families, kids, and anybody in the neighborhood is not able to walk on the sidewalk, which that's what the

sidewalk is for.

Q.   This group of people who were seated in the chairs, some of which you've described as blocking the sidewalk, were they engaged in any illegal activity that you observed?

A.   Later I established probable cause, yes.

Q.   And what did you see that led you to believe that you'd established probable cause?

A.   An open container of alcohol.

THE COURT:   You said what?

THE WITNESS:   An open container of alcohol.

Q.   Did you determine who was -- or where did you see the open container of alcohol?

A.   Yes, I later found out the name of the individual after the observation.

Q.   I asked a bad question.   Let me rephrase.

When you say you saw a possession -- an open container of alcohol, did you see someone possessing the open container of alcohol?

A.   Yes.

Q.   And where did you see that person possessing the open container of alcohol?

A.   So he was seated to my left side, seated on a lawn chair on the sidewalk.

Q.   And when you first saw this person holding the -- possessing the open container of alcohol, were you still in

your police vehicle?

A.  Yes.

MR. McDANIEL:  Objection, Your Honor; leading.

THE COURT:  Sustained.  I don't think he specifically said what you asked him.  Rephrase.

MR. HELFAND:  Let me rephrase the question.

Q.  Did you see a person holding the open container of alcohol?

A.  Yes.

Q.  And where were you physically when you saw the person holding the open container of alcohol?

A.  I was in my cruiser.

Q.  When you saw the person holding the open container of alcohol, did you tell anyone else in the police vehicle you were in?

A.  I don't believe so.

Q.  Did you go over the radio at that time?

A.  No.

Q.  Were you wearing a body-worn camera on August 22nd of 2025?

A.  Yes.

Q.  And prior to testifying today, have you had the opportunity to watch footage from your body-worn camera from August 22nd?

A.  Yes.

Q.   Would you recognize it, if you saw it again?

A.   Yes.

          MR. HELFAND:  And I'm going to bring up what we'll mark for identification purposes as Government's Exhibit 1.

Q.   Is Government Exhibit 1 on the screen in front of you, sir?

A.   Yes.

Q.   Do you recognize what you see on the screen in front of you?  And I can play a few seconds, if that would help.

A.   Yes, please.

          (Video playing)

Q.   I've played, for the record, from the beginning of Government Exhibit 1 to timestamp 21:59:51.  Do you recognize Government Exhibit 1?

A.   Yes.

Q.   Is this your body-worn camera from August 22nd of 2025?

A.   Yes.

Q.   And you've had an opportunity to watch it before testifying today?

A.   Yes.

Q.   And does Government Exhibit 1 fairly and accurately depict events as they occurred on August 22nd of 2025, to the best of your memory?

A.   Yes.

          MR. HELFAND:  We'd move for the admission of

Government Exhibit 1 into evidence, Your Honor.

THE COURT:  Any objection?

MR. McDANIEL:  No objection.

THE COURT:  Admitted.

MR. HELFAND:  I'm going to bring us forward here to approximately timestamp 22:01:15 and begin playing from that timestamp.

(Video playing)

MR. HELFAND:  And I'm pausing, for the record, at timestamp 22 --

THE COURT:  One moment.

Are you able to see, Counsel?

MR. McDANIEL:  I'm trying to turn it on just to make sure.  It's not here just yet.

THE COURT:  We'll see if we can get it operational for you.

(Pause)

THE COURT:  We'll have to take a short break so we can get that fixed.

(Recess taken)

THE COURT:  You may proceed.

MR. HELFAND:  And for the record, I paused Government Exhibit 1 at 22:01:39.

BY MR. HELFAND:

Q.  Can you tell us whether you're in the 1400 block of

Saratoga Avenue, Northeast, at this point?

A.  Yes.

Q.  And are you able to see on the screen approximately where the individuals you described to us earlier were located?  The individuals who are seated in the chairs that caught your attention.

A.  I can give you the general area, yes.

Q.  And can you circle on the screen approximately where those individuals were located, if you're able to see on the screen.

A.  Yes.

Q.  You should be able to draw on the screen.  Just take your finger and draw on the area.

Is it not working?

A.  I don't think so.

MR. HELFAND:  If you'd like, Your Honor, I can keep moving forward.

THE COURT:  Very well.

Q.  Can you just describe for us on the -- where on the screen we can see the individuals who caught your attention?

A.  To the spotlight on my cruiser to the left.

Q.  And when you -- you say the spotlight on the cruiser. Were you able -- are you talking about in the interior handle that we can see on the part of the vehicle on the left-hand side of the screen?

A. Correct, yes. You can't see on this photo the actual spotlight, but yes, to be more specific, to the left side of the handle of the spotlight on my cruiser.

MR. HELFAND: And I will continue playing -- actually, let me ask this question.

Q. At this point approximately, were you able to see the individual who was possessing the open container of alcohol?

A. Not yet.

Q. All right. I'll continue playing.

(Video playing)

A. Yes.

MR. HELFAND: I'm, for the record, paused at 22:01:44.

Q. It sounded like you just said yes. Why did you just say yes?

A. That's when I saw the individual with the open container of alcohol.

MR. HELFAND: Continue playing from 22:01:44.

(Video playing)

MR. HELFAND: Pausing at 22:01:56.

Q. Are you pointing your flashlight at someone?

A. Yes.

Q. Who are you pointing your flashlight at?

A. We later determined that his name was Mr. Antwain Simpson.

Q.  And why are you pointing your flashlight at Mr. Simpson?

A.  I'm confirming the observation that I made when I was in the vehicle.

Q.  And the observation that you're referencing, is that the possession of the open container of alcohol you talked about?

A.  Correct.

MR. HELFAND:  Continue playing from 22:01:56.

THE COURT:  One moment.  He's going to check and see.

(Pause)

THE COURT:  You may proceed.

MR. HELFAND:  Thank you, Your Honor.

I'll continue playing from 22:01:56.

(Video playing)

MR. HELFAND:  Pausing at 22:02:16.

BY MR. HELFAND:

Q.  When you approached Mr. Simpson at this point, was he still holding the container of alcohol you saw him holding earlier?

A.  No.

Q.  Did you see what Mr. Simpson did with the container of alcohol you saw him holding?

A.  Yes.  He placed it on the left side of the lawn chair where he was sitting.

Q.   Can you just pull the microphone a little closer to you. I just want to make sure I can hear you.

A.   He placed it down on the ground to the left side of the lawn chair where he was sitting.

Q.   Can you tell us where you were when you saw Mr. Simpson place the container of alcohol down on the left side of the lawn chair where he was seated?

A.   When I was in the car about to exit.

Q.   When you were in your vehicle, could you tell what kind of container of alcohol Mr. Simpson was holding?

A.   I had a suspicion based on my training and experience recovering those specific bottles before.

Q.   And when you say you had a suspicion, what was your suspicion?

A.   To be an alcoholic beverage.

Q.   And did you have a sense of what kind of alcoholic beverage it could be at that point?

A.   Not yet.

Q.   When you saw Mr. Simpson holding the container of alcohol, could you describe what you could see about the container.  Could you just -- in terms of what you saw the bottle looked like.

         MR. McDANIEL:  Objection, Your Honor.  I'm asking for a time.  When?  Because there are different times.

         THE COURT:  Yes, be more specific.

MR. HELFAND:  I'll rephrase the question.

Q.  While you were still in your vehicle -- you testified earlier while you were still in your vehicle you could see Mr. Simpson holding a bottle of alcohol; is that correct?

A.  Yes.

Q.  When you were in the vehicle, what could you see about the bottle of alcohol he was holding?

A.  The bottle was small, and the bottle had a colorful cap.

THE COURT:  Colorful what?

THE WITNESS:  The cap on the bottle was colorful.

Q.  Could you see what color it was from your vehicle?

A.  It looked pink.

Q.  And when you described the bottle being small, you held your thumb and your forefinger apart; is that correct?  Just now.

A.  Yes.

THE COURT:  When you say it looked pink, what are you talking about?

THE WITNESS:  The cap was pink in color.

MR. HELFAND:  All right.  I'll continue playing the body-worn camera from 22:02:16.

(Video playing)

MR. HELFAND:  Pausing at 22:02:44.

Q.  It looks like you're just standing still right now; is that correct?

A.   Yes.

Q.   Why are you just standing there?

A.   Waiting for other MPD officers to get close to me.

Q.   And why are you waiting for another or other MPD officers to get closer to you?

A.   So we can investigate further and make the stop.

Q.   Is there another or did we see another officer in the area while you were -- where you were standing -- let me rephrase the question.

Were there other law enforcement officers with you besides MPD officers on August 22nd?

A.   Yes.

Q.   And did we see any of them near you in the portion of the body-worn camera we just watched?

A.   Yes.

Q.   Why didn't you approach Mr. Simpson with one of those other law enforcement officers?

A.   I have worked with the crime suppression unit for some time.  We train together.  We work together.  We patrol together.  I'm very comfortable working with them.

The individual that walked past, my point of view, the BWC point of view, I have not worked with, and I was just waiting for one of the officers from the crime suppression unit to get close to me.

Q.   And did one of the officers from the crime suppression

unit eventually come over to where you were standing?

A.   Yes.

MR. HELFAND:  Continue playing from 22:02:44.

(Video playing)

MR. HELFAND:  Pausing at timestamp 22:03:38.

Q.   Are you shining your flashlight at Mr. Simpson again?

A.   Yes.

Q.   What are you looking for when you're shining your flashlight at Mr. Simpson?

A.   I'm looking to see what else I see in the waist area.

Q.   Did you see anything else in Mr. Simpson's waist area?

A.   I see that he's wearing a satchel.

Q.   Did you see anything -- what, if anything, did you observe about the satchel that he was wearing?

A.   At some point I noticed that the satchel was a -- the zipper was not closed all the way.

Q.   And could you see anything extending or visible in that -- in the satchel where the zipper was partially open?

A.   Yes.

Q.   What could you see?

A.   I was able to see a white-in-color resealable bag, which we call mylar bags, inside the satchel.

Q.   And what, if anything, was significant to you about the white resealable mylar bag that you could see?

A.   Based on my training, knowledge, and experience

recovering multiple resealable bags or mylar bags, those bags are used to hold marijuana.

MR. HELFAND:  I'm going to continue playing from timestamp 22:03:38.

(Video playing)

MR. HELFAND:  Pausing at timestamp 22:03:45.

Q.  Was that your voice we just heard?

A.  Yes.

Q.  And you just asked Mr. Simpson how much weed do you have in that bag?

A.  Correct.

Q.  Why did you ask him that question?

A.  Because I had already observed the corner of the mylar bag inside the satchel that he was wearing.

Q.  At this point in the video at 22:03:45, was another MPD officer with you?

A.  Yes.

Q.  Who was with you at this point?

A.  Officer Harleston.

MR. HELFAND:  Continue playing from 22:03:45.

(Video playing)

MR. HELFAND:  Pausing at timestamp 22:03:53.

Q.  Did you just point at Mr. Simpson's satchel?

A.  Yes.

Q.  When you said earlier that you could see part of a white

mylar bag, do you recall which part of the bag you could see sticking out of Mr. Simpson's satchel?

A.  Yes.  Based on my training, knowledge, and experience manipulating, recovering, and seizing those kinds of bags, I was looking at the top portion, the portion that seals back, the one that has the little strip that seals the bag.

MR. HELFAND:  Continue playing from timestamp 22:03:53.

(Video playing)

MR. HELFAND:  Pausing at timestamp 22:04:03.

Q.  In the part of the video we just saw, did Mr. Simpson open his satchel?

MR. McDANIEL:  Your Honor, I'm going to object to the leading.

THE COURT:  It is.  Rephrase.

MR. HELFAND:  I will -- I'm going to back up and play another portion of the video and then ask you to describe to us what we just saw.

And we'll restart from 22:03:46.

(Video playing)

MR. HELFAND:  Pausing at 22:04:00.

Q.  Can you tell us what we just saw Mr. Simpson do in the video we watched.

A.  Mr. Simpson pulled out the mylar bag that I was looking at inside his satchel.

Q.  Did you ask him to take the mylar bag out of his satchel?

A.  No.

Q.  What did you ask Mr. Simpson to do with the satchel when you were talking to him?

A.  I asked him to fold it.

Q.  Why did you ask him to fold the satchel?

A.  Based on my training, knowledge, and experience with individuals carry illegal firearms in satchels.  For my safety and the safety of everybody else around, I asked to fold the satchel to make sure that there was not a hard object or illegal firearm in the satchel.

        MR. HELFAND:  Continue playing from 22:04:00.

        (Video playing)

        MR. HELFAND:  I'll pause at 22:04:13.

Q.  Can you tell us what just happened in the video we watched.

A.  My partner and I moved forward to detain and handcuff Mr. Simpson.

Q.  And why did you and your partner place Mr. Simpson in handcuffs?

A.  I had established probable cause that Mr. Simpson was holding the open container of alcohol.  And also, the mylar bag that he pulled out from his satchel, based on my training, knowledge, and experience, that bag can hold more

than two ounces, which is the legal amount that an individual can have.

Q. When you saw the white mylar bag that you believed could hold more than two ounces of marijuana, could you tell how much marijuana was in the bag at that point?

A. No.

Q. Do you recall what you said to Mr. Simpson when you were placing him in handcuffs?

A. I think so.

Q. I'm sorry?

A. I think so.

Q. And what do you recall telling him when you placed him in handcuffs?

A. "You're not under arrest. You're being detained."

Q. And why did you tell him he was not under arrest and just being detained at that point?

A. I have been involved in multiple arrests and investigations in the 1400 block of Saratoga Avenue, Northeast. Every time we go make a detention or an arrest on this block -- based on my experience, it's one of the most violent blocks against law enforcement.

I have been involved in multiple uses of force and assaults on police officers in this block in particular because there's a lot of people out, and they outnumber us pretty much almost all the time.

Q.   Did you believe -- I'll withdraw that question.

        MR. HELFAND:   Continue playing from 22:04:13.

        (Video playing)

        MR. HELFAND:   Pausing at 22:04:29.

Q.   Is Officer Harleston visible in the body-worn camera at this point?

A.   Yes.

Q.   What is he doing?

A.   He pulled out the mylar bag that Mr. Simpson had shown us earlier from the satchel.

Q.   Is he starting to search Mr. Simpson's satchel?

A.   Yes.

Q.   Previously, when you saw Mr. Simpson take the white mylar bag out of his satchel, could you see into the satchel?

A.   Yes.

Q.   What, if anything, could you see when you were able to look into the satchel at that point?

A.   I saw additional mylar bags inside as well as plastic bags.

Q.   And based on your training and experience, what, if any, significance did the additional mylar bags and plastic bags that you saw have to you?

A.   That mylar bags, based on my training, knowledge, and experience, hold marijuana, so I suspected that those mylar

bags inside the satchel also contained marijuana.

MR. HELFAND:  Continue playing from timestamp 22:04:29.

(Video playing)

MR. HELFAND:  I'm pausing at 22:04:34.

Q.  What did we just see you do in the body-worn camera that I just played?

A.  I was conducting a protective patdown on Mr. Simpson.

Q.  And did you say anything while you were -- during that protective patdown that you conducted?

A.  Yes.

Q.  What did you say?

A.  One-eight.

Q.  And what does that mean?

A.  That is the predetermined code word that we use in the crime suppression team at the Fifth District for the presence of a firearm on an individual.

MR. HELFAND:  I'll continue playing briefly from timestamp 22:04:34.

(Video playing)

MR. HELFAND:  Pausing at timestamp 22:04:45.

Q.  What did you do after you announced the predetermined code word for Mr. Simpson having a gun?

A.  So can you repeat the question?

Q.  Yes.  After you said one-eight, what did you do next

while you're on scene back on August 22nd?

A.  Trying to manage the scene.  Trying to figure out who we're going to take him to.  I'm thinking how I'm going to preserve the scene.

Q.  And did you go back over to where Mr. Simpson was seated to try and find the bottle that you told us about earlier?

A.  Yes.

Q.  Did you find that bottle?

A.  Yes.

MR. HELFAND:  Continue playing from 22:05:46.

(Video playing)

MR. HELFAND:  Pausing at 22:05:49.

Q.  What did you just take a picture of?

A.  The bottle on the ground, the one that Mr. Simpson placed on the left side.

MR. HELFAND:  Continue playing from 22:05:49.

(Video playing)

Q.  And what did we just see you do in the body-worn camera?

A.  That's the bottle, the open container of alcohol.

MR. HELFAND:  And for the record, I paused at 22:05:53.

Q.  That picture you took of the bottle we just saw, would you recognize it if you saw it again?

A.  Yes.

MR. HELFAND:  I'm going to bring up Government

Exhibit 8.

Q. Do you recognize Government Exhibit 8?

A. Yes.

Q. What is it?

A. That's the photo that I took before I seized the bottle.

Q. And does this photograph fairly and accurately depict the bottle as you saw it on August 22nd before you recovered it?

A. Yes.

MR. HELFAND: We'd move for the admission of Government Exhibit 8 into evidence, Your Honor.

THE COURT: Any objection?

MR. McDANIEL: No objection, Your Honor.

THE COURT: Admitted.

Q. Can you tell us where the bottle is in relation to the chair you saw Mr. Simpson seated on?

A. It's under the chair to the right.

Q. And is that where you saw Mr. Simpson initially place the bottle earlier?

A. No.

Q. As part of your preparation for testifying today, did you also have the opportunity to watch body-worn camera from Officer Malik Harleston?

A. Yes.

Q. Would you recognize that body-worn camera if you saw it

again?

A.   Yes.

MR. HELFAND:  I'll show you what we'll mark as Government Exhibit 2.  I'll play it from the beginning, just a few seconds for you, from 21:59:40, pausing at 21:59:43.

Q.   Do you recognize Government Exhibit 2?

A.   Yes.

Q.   And is this Officer Malik Harleston's body-worn camera?

A.   Yes.

Q.   Does Government Exhibit 2 fairly and accurately depict a portion of Officer Harleston's body-worn camera from August 22nd of 2025?

A.   Yes.

MR. HELFAND:  We'd move for the admission of Government Exhibit 2 into evidence, Your Honor.

MR. McDANIEL:  No objection.

THE COURT:  Admitted.

MR. HELFAND:  I'm going to take us to timestamp 22:01:19.  I'm sorry, I'll take us a little bit further, excuse me.

I'll bring us to 22:03:20.

(Video playing)

MR. HELFAND:  Pausing at 22:03:38.

Q.   Can you tell us what we see in the video clip here.

A.   Yes.  You see the individuals that I observed when I

came and made a left turn on the 1400 block of Saratoga Avenue, Northeast.

Also, Mr. Simpson is seated on the lawn chair, and you can also see the bottle that I initially saw placed on the ground on the left side of the lawn chair.

Q. Are you visible in this video clip as well?

A. Correct.

Q. Where are you standing?

A. To the left of the view.

MR. HELFAND: I'm going to continue playing from Government Exhibit -- continue playing Government Exhibit 2 from 22:03:38.

(Video playing)

MR. HELFAND: I'm pausing at timestamp 22:03:48.

Q. Is the bottle that you saw Mr. Simpson holding still visible in Government Exhibit 2?

A. Yes.

Q. And can you tell us where it is?

A. It's still to the left of the lawn chair on the ground.

Q. And for the record, is it fair to say that what you're describing is in the bottom middle portion of the screen in Government Exhibit 2 behind one of the silver legs of Mr. Simpson's chair?

A. Yes.

MR. HELFAND: Continue playing from timestamp

22:03:48.

(Video playing)

MR. HELFAND:  I just paused at timestamp 22:03:59.

Q.  Can you tell us what we just saw happen in that portion of the body-worn camera clip?

A.  Mr. Simpson opened up his satchel and pulled out the mylar bag and showed it to us.

Q.  And is that when you were able to see inside of Mr. Simpson's satchel?

A.  Yes.

MR. HELFAND:  Continue from 22:03:59.

(Video playing)

MR. HELFAND:  Pausing at timestamp 22:04:34.

Q.  When you and Officer Harleston placed Mr. Simpson in handcuffs, did you believe you had probable cause to arrest him at that point?

A.  Yes.

Q.  After you felt the firearm in Mr. Simpson's waistband, do you know if officers recovered a firearm from Mr. Simpson's pants?

A.  Yes.

MR. HELFAND:  I'm going to show you what we'll mark as Government Exhibit 10.

Q.  Do you recognize Government Exhibit 10?

A.  Yes.

Q.  Can you tell us what this is.

A.  This is a photo that Officer Harleston took before manipulating the firearm on Mr. Simpson's person.

Q.  And does Government Exhibit 10 fairly and accurately depict the photograph that Officer Harleston took, to the best of your knowledge?

A.  Yes.

MR. HELFAND:  We'd move for the admission of Government Exhibit 10 into evidence.

MR. McDANIEL:  No objection.

THE COURT:  Admitted.  How will these be preserved?

MR. HELFAND:  I'm sorry, Your Honor?

THE COURT:  How will these be preserved?  I mean, they're not actually physically being marked, but how will they be preserved for potential future use?

MR. HELFAND:  Yes, Your Honor.  We can have them digitally stamped after this hearing and then saved.

THE COURT:  Okay.

MR. HELFAND:  I'm just taking us back to Exhibit 2 briefly.  I'm going to take us to timestamp -- continue playing from 22:04:34.

(Video playing)

MR. HELFAND:  Pausing at timestamp 22:04:57.  I'm going to take us forward and play it forward from timestamp

22:05:14.

(Video playing)

MR. HELFAND:  That was the conclusion of Government Exhibit 2.

Q.  Can you tell us what we just saw in Government Exhibit 2 towards the end of that video clip?

A.  My partner, Officer Harleston, took photos of the firearm on Mr. Simpson's person, and then he went and retrieved it from his person.

Q.  And was that firearm photographed and processed after it was recovered?

A.  Yes.

Q.  Would you recognize a photograph of the weapon if you saw it again?

A.  Yes.

Q.  I'm showing you what we'll mark as Government Exhibit 11.  Do you recognize Government Exhibit 11?

A.  Yes.

Q.  Can you tell us what this is?

A.  That's the firearm that was recovered from Mr. Simpson's person.

Q.  And does Government Exhibit 11 fairly and accurately depict the photograph of the firearm recovered from his person on August 22nd?

A.  Yes.

MR. HELFAND:  We'd move for the admission into evidence of Government Exhibit 11.

MR. McDANIEL:  No objection.

THE COURT:  Admitted.

MR. HELFAND:  Last few exhibits I just want to go through with you, Officer.  I'm going to show them to you as a group, and we'll bulk admit them.

Q.  First I'm going to show you Government Exhibit 12, and I'm going to proceed through Government Exhibits 12, 13, 14, 15, 16, and 17.

Do you recognize Government's Exhibits 12 through 17?

A.  Yes.

Q.  And can you tell us generally what these photographs are of?

A.  Those were photos taken from the items that were found inside Mr. Simpson's satchel.

Q.  And do Government Exhibits 12 through 17 fairly and accurately depict the items that were recovered from Mr. Simpson's satchel?

A.  Yes.

MR. HELFAND:  We'd move for the admission into evidence of Government's Exhibits 12 through 17.

THE COURT:  Any objection?

MR. McDANIEL:  No objection.

THE COURT:  Admitted.

Q.  Taking us to Government Exhibit 13, can you tell us what Government Exhibit 13 is.

A.  This is the mylar bag that I initially saw the corner of when Mr. Simpson was holding the satchel and the zipper was not fully closed.

Q.  And could you tell us what Government Exhibit 14 depicts.

A.  A green leafy substance inside the mylar bag.

Q.  And taking us to Government Exhibits 15 and 16, can you tell us what those two pictures show?

A.  Those are the additional mylar bags that were found and seen on Mr. Simpson's satchel.

Q.  And finally Government Exhibit 17.  Can you tell us what we see here?

A.  That was the white rock-like substance that was found inside Mr. Simpson's satchel.

Q.  And was this substance field-tested?

A.  Yes.

Q.  And what were the results of that field test, if you recall?

A.  It tested positive for cocaine base.

MR. HELFAND:  Just a brief indulgence, Your Honor.

(Pause)

MR. HELFAND:  No further questions.  Thank you.

THE COURT:  Cross-examination.

MR. McDANIEL:  Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. McDANIEL:

Q.  Good afternoon, Officer Sibrian.

A.  Good afternoon.

Q.  So you've been working on the MPD police force for you said eight years?

A.  Yes.

Q.  And all of that has been in the Fifth District?

A.  Yes.

Q.  And you said that you had been involved with a number of different investigations, arrests, community contact in the 1400 block of Saratoga before the date in question resulting in the arrest of Mr. Simpson; is that right?

A.  Correct.

Q.  Do you remember what the date of the arrest of Mr. Simpson was?

A.  You said the date?

Q.  The date.

A.  August 22, 2025.

Q.  Okay.  Now, it's true, is it not, sir, that as you sit here today you are the subject of a number of different open investigations based upon complaints made in connection with your police work?  Is that right?

A.   That is correct.

Q.   And there's one latest investigation that was opened that's not even on your PPMS report.  That just happened in the last day or so; is that right?

A.   More than a day or so.  Yes.

Q.   What was the subject matter of that complaint?

A.   Well, I wouldn't call it a complaint.  It's an internal investigation for use of force.

Q.   Okay.  And that's open now, correct?

A.   That is correct.

Q.   All right.  And then you have one that's open from an incident on January 3, 2026, involving alleged harassment and the unnecessary use of force.  Do you recall that?

A.   I have multiple open OPC complaints.

Q.   Right.  So I'm asking if you recall that one in particular.  It was a complaint from January 3, 2026, where the allegation was that you unlawfully searched a vehicle and placed the individual who was in the vehicle in handcuffs.  Do you recall that?

A.   No.

Q.   Okay.

          MR. McDANIEL:  If I could approach, Your Honor?

          THE COURT:  Yes.

Q.   Do you know what a PMS report is?

A.   Yes.

Q.  Have you seen yours?

A.  Yes.

Q.  When is the last time you saw it?

A.  Today.

Q.  Okay.  So in your review from today, do you recall seeing this one from January 3, 2026?  You can read that synopsis there.

A.  (Witness reviews document) Yes.

Q.  And that is for unnecessary force and harassment, correct?  In connection with a search of a vehicle, correct?

A.  Yes.

Q.  And we might as well stay here so that if you need to review this you can do it.

Are you familiar with this one from November 21, 2025, an open investigation into a -- it looks like another search of another vehicle?

A.  Yes.

Q.  And the complaint there was that you searched it without justification?

A.  Yes.

Q.  Are you familiar with this one from November 19, 2025? This is an open and pending investigation.  Do you see that one there?

A.  Yes.

Q.  And that's with respect to another stop of another

civilian, at least the allegation?

A.  Yes.

Q.  I'm going to skip these ones that are closed.  Okay?

But there are several of them that are even closed now; is that right?

A.  Yes.

Q.  Would you say at least eight or nine have been opened and closed at some point in time?

A.  That's a good estimate.

Q.  And many of those involve allegations that you searched individuals --

MR. HELFAND:  Objection, Your Honor.

THE COURT:  Be more specific.

MR. HELFAND:  With regard to the objection?

THE COURT:  Excuse me?  Basis for the objection?

MR. HELFAND:  With regard to relevance as to just the general existence of open and closed investigations.

THE COURT:  Overruled.

Q.  This one here from July of 2025, this, again, is for harassment.  That's still pending and open; is that right?

A.  Yes.

Q.  And this is in regard to an allegation of an unlawful search that resulted in the recovery of a firearm?

A.  Yes.

Q.  When the cases are still open and you have so many, do

they allow you just to continue to do police work even though you have --

MR. HELFAND:  Objection, Your Honor.

THE COURT:  Overruled.

Q.  Even though you have all these open investigations, they just allow you to continue to do police work?

A.  If I didn't do anything wrong, yes.

Q.  Well, some of them are pending so we don't know what the outcome is, right?

A.  We don't know, yes.

Q.  As a matter of fact, many of them I asked you about particularly are still pending and open, correct?

A.  Correct.

Q.  So I'm asking you if, in fact, you're allowed to continue this police work even while all these pending investigations are open?

MR. HELFAND:  Objection; asked and answered.

THE COURT:  Overruled.

A.  I'm here in full capacity, so yes.

Q.  There's one here from June of 2025 that's still pending and open; is that right?

A.  From what I can see, yes.

Q.  You don't have any reason to believe that this report is inaccurate, right?

A.  I do.

Q.   You have reason to believe that the information is inaccurate?

A.   Yes.

Q.   How so?

A.   Those are pending investigations.  I would like to speak to counsel or a union rep before I say anything further because those investigations are still open.

Q.   Right.  So the investigations say they're open, right?

A.   Uh-huh.

Q.   And so I'm asking you, do you have any reason to believe that the fact that it says that it's open is incorrect?

MR. HELFAND:  Objection as to relevance, Your Honor.

THE COURT:  Just the fact that they're open?

MR. McDANIEL:  Just the fact that they're open.

A.   Those are allegations.

Q.   I get it, but they're open, right?

A.   Those are allegations, all investigations that are open, yes.

Q.   So we're agreeing.  We're not disagreeing.  I just said they're open.

A.   I don't think I said we're disagreeing.

Q.   Okay.  So you have one -- this one was sustained from September 16, 2023.  Do you see that there?

A.   Yes.

Q.  Sustained and disclosed.

Another one that was sustained and disclosed from August 15, 2023?

A.  What is that for?

Q.  That is for you failed to report to tactical training.

A.  Yes.

Q.  You have some here for failure to activate your body-worn camera.  That was sustained, correct?

A.  I have one, I think, yes.

Q.  You have one where you began a pursuit of a vehicle, turned your body-worn camera off, and then turned it on later in connection with the arrest of that individual.  Do you recall that?

A.  I have an investigation for an unauthorized vehicle pursuit on the department, yes.

Q.  And you think that one was from March of 2022?

A.  I know that it's from March, yes, 2022.

Q.  And then you have one from February 2021.  The allegation was excessive use of force.  That was sustained; is that right?

MR. HELFAND:  Objection.

THE COURT:  Overruled.

A.  When I was fighting an armed individual for five minutes, and the armed individual was reaching for his illegal firearm, and I accidentally touched his neck, yes,

that is an investigation that was sustained then.

But it was already overruled this year.  I have proper documentation that they overruled that, and it's not -- no longer sustained.

Q.  Okay.  What about this one that was sustained from January of 2021 for pointing your firearm at someone?  That was sustained.  Do you see that one there?

A.  I see it.

Q.  Was that one overturned?

A.  No.

Q.  That one's still standing.

What about this one here from October 3rd of 2020.  That was sustained?

A.  What is it about?

MR. HELFAND:  Objection, Your Honor.

THE COURT:  Basis?

MR. HELFAND:  This does not go to motive to curry favor.  The age of the complaints, too, likely, again, renders any -- to curry favor with regard to --

THE COURT:  She needs to hear you.  We can't hear you.

MR. HELFAND:  I'm sorry, Your Honor.  I'll approach.

Just with regard to the fact that these were sustained, and, given their age, we would submit that they

don't go to motive to curry favor or bias so additional cross on these would be improper.

THE COURT:  Response?

MR. McDANIEL:  They're all relevant, Your Honor. They go to the reliability of this officer as a witness in this -- the lone witness in this matter.  And to the degree that we have to rely upon his testimony, I think all of these are relevant.

THE COURT:  I'll overrule the objection.

Q.  So I will not go through the rest of them, but there are some more on here that we haven't talked about; is that right?

A.  I believe you finished.

Q.  Okay.  So what about this one here from October 3rd of 2020?  Was that also sustained?

A.  What is it about?

Q.  Body-worn camera failure.

A.  What was the question?

Q.  Was that sustained?

A.  I don't know if it was sustained.

Q.  Well, it says sustained there.  That's what sustained/ disclosed means.

A.  I don't see this formatting.

Q.  Is this the one that you reviewed earlier today?

A.  I believe it looked different.

Q.   And this one from May 7th of 2020, that was also sustained related to an accident that you were in; is that right?

A.   The vehicle accident, yes.

Q.   Okay.  Now, you told us that you'd been involved with policing the Fifth District for about eight years now, correct?  And particularly Saratoga, 1400 block of Saratoga; is that right?

A.   I have patrolled the 1400 block of Saratoga throughout the years that I worked at the Fifth District.

Q.   And on the day in question, when Mr. Simpson was arrested, you didn't receive any call to report there, correct?

A.   Correct.

Q.   There was no 911 call.  Nobody asked you all to come to the 1400 block of Saratoga before you drove into it, right?

A.   Officers were already on the block.

Q.   They were already -- that was one of my next questions.

When you arrived there, there were already officers that were actually in the block, correct?

A.   There's always officers on the block.  That's a 24/7 hot spot that we have to cover with officers with lights on their cruisers 24/7.

Q.   So then the answer to my question is yes; is that right?

A.   There were officers on the block.

Q. Okay. And in addition to the officers that are normally on the block, there were other officers that appeared in the block at that time that you arrived, correct?

A. Correct.

Q. Other than the officers that are even normally there; is that right?

A. Correct.

Q. And it's true, is it not, sir, that before you all went into the block, there was some discussion about the coordinated effort to have a law enforcement presence in that block on that evening? Is that fair to say?

A. Yes.

Q. It wasn't an accident that all of you all arrived in the 1400 block of Saratoga, correct?

A. My job is not an accident, yes. It's coordinated.

Q. Your job is not an accident. I'm talking about what you were doing that day.

So the fact that while you were doing your job all these officers appeared in the 1400 block of Saratoga was not an accident, correct?

In other words, you all had agreed that you were all going to do it.

A. It's part of my job to patrol --

Q. So listen, all you have to do is answer my questions, and this will be fine.

What I asked you was whether or not there was some agreement between you and the other officers that appeared in the 1400 block of Saratoga before you got there.  Yes or no?

MR. HELFAND:  Objection; asked and answered, Your Honor.

THE COURT:  Overruled.

A.  It is part of my job to patrol any area in the Fifth District.

Q.  So he'll have an opportunity to ask you some questions where you can provide narratives.  Some of my questions just are yes or no.

So you all talked about it before you got there, yes?

A.  We communicated over the radio, and we talked about the operational procedure and how to approach the block.

Q.  Okay.  How many officers participated in that conversation?

MR. HELFAND:  Objection as to relevance.

THE COURT:  Overruled.

A.  More than two.

Q.  How many law enforcement vehicles do you recall being there in that block at the time that you arrived there?

A.  That were already there?

Q.  That were already there.

A.  At least one.

Q.  Okay.  And we see one when you arrive.  There's a police vehicle that's already on the block when you arrive there, correct?

A.  Correct.

Q.  And then in the review of your body-worn camera, because you've seen that, you see a vehicle that's right behind you, which is also an MPD vehicle, correct?

A.  I don't believe the vehicle behind me was an MPD vehicle.

Q.  Okay.  Do you believe it was a law enforcement vehicle?

A.  Yes.

Q.  And what kind of law enforcement vehicle was that?

A.  I don't know.

Q.  And so just so we're clear, there was no illegal activity that was reported in the block before you actually got there on that day?

A.  Correct.

Q.  Now, let me show you what has been marked as Government's Exhibit No. 1 and ask you some questions about that, which is your body-worn camera.

Before I push "play" on that, you said that you had participated in a training which gave you some -- which provided you with some training regarding what to look for when investigating individuals who you are observing.  You

used the word "blading" in connection with that training. Do you remember that?

A.   Yes.

Q.   And blading is when you see someone, and they see law enforcement, and they try to turn themselves so that you all can't see them as well; is that right?

A.   Yes, that is part of -- yes.

Q.   And looking away, you described that -- you're interacting with someone, and they're looking away; is that right?

A.   Correct.

Q.   If an individual is walking in a certain way, you described that as being some type of indication; is that right?

A.   Yes.

Q.   And you didn't include this, but it's also true that you all look for individuals who are acting nervous; is that right?

A.   We look for a number of body language characteristics.

Q.   And individuals that are acting nervous is part of that group, if you will.

A.   We look for a number of characteristics of individuals. Body language and movements.

Q.   Is acting nervous part of that training that you have received to look for if individuals are acting nervous?  Yes

or no?  I mean, maybe you'll tell me if that's not relevant, if somebody is acting nervous.

A.  I don't recall that part of the training.

Q.  Okay.  And also part of the training, and you've learned this as part of your law enforcement activity and duties, are the concepts of articulable suspicion.  You know what articulable suspicion is --

A.  Yes.

Q.  -- and what probable cause is.

A.  Yes.

Q.  And you knew before August of -- you said August 2025 that the arrest took place?

A.  What was that?  What was the question?

Q.  I'm sorry, Mr. Simpson was arrested in August of 2025?

A.  He was arrested on, yes, 8/22/2025.

Q.  I'm not trying to trick you.  The point is that before you arrested Mr. Simpson, you were familiar with these concepts, these legal concepts; is that right?

A.  Yes.

Q.  And before you entered into the block of 1400 Saratoga, you were driving in the vehicle, and you were actually the driver of this marked vehicle; is that right?

A.  Yes.

Q.  And you said that there was maybe two other officers that were in the vehicle with you?

A.   Officer Harleston was my passenger.

Q.   And it was just the two of you, or do you recall?

A.   I believe it was just the two of us.

Q.   And you drove into the block, and it's your testimony that at some point in time while you were actually still in the car you see Mr. Simpson with this what you called an open bottle of what you believed to be liquor with the red top on it; is that right?

A.   Yes.

Q.   Starting your body-worn camera video at what would be 22:01 and 17 seconds, this is you behind the wheel of the vehicle, correct?

A.   Yes.

         (Video playing)

Q.   Here we see you approaching the 1400 block of Saratoga.

A.   Yes.

Q.   Are you already on the 1400 block of Saratoga at this time?

A.   Yes.

Q.   Now, how long would you say you actually observed this bottle in the hands of Mr. Simpson?

A.   Seconds.

Q.   Two, three seconds?  One second?

A.   Maybe two seconds.

Q.   And, when you were looking at this video on direct

examination, you proclaimed at some point in time that it was then right before you got out of the vehicle that you saw this bottle in Mr. Simpson's hand.  Do you recall that testimony?

A.  Yes.

Q.  So I'm stopping this video at 22:01:39.  Do you see that?

A.  Yes.

Q.  Now, do you see an individual there right to the left of your mirror that's standing there in a gray shirt?  Do you see him?

A.  No.

MR. McDANIEL:  With the Court's permission?

THE COURT:  Yes.

Q.  This individual right here, do you see him now that I pointed to him?

A.  I believe he was wearing a blue shirt or light blue.

Q.  Okay.  So do you see an individual in the light blue shirt or we'll use yours -- light blue shirt standing next to the mirror in your vehicle?

A.  Yes.

Q.  Okay.  And right to the left of that, does that look like the area that Mr. Simpson would have been siting in that chair?

A.  Yes.

Q.   And are you able to see Mr. Simpson in that chair right next to the individual in the blue shirt?

A.   No, not on this view.

Q.   You can't see him there?

A.   I see his shadow.

Q.   Well, it's nighttime, right?

A.   Yes.

Q.   So is it your experience that you see shadows at night?

In any event, do you see right here what looks to be another individual, and it's like a little light at the bottom of that frame?

A.   Yes, there's something shining on the -- close to the ground, I think.

Q.   So just looking at that, you don't see that individual or that thing, that shadow, with anything in its hand, right?

A.   In this view from my BWC you don't see that.

Q.   Right.  And I get it.  You're saying that that picture is not as good, and when I came up there, it wasn't, so I'm going to show government counsel my video, and then I'll come up to you and show you what it is I have on my computer.  Maybe you'll see it a little better.  Okay?

(Pause)

MR. McDANIEL:  It was better when I had it plugged in, Your Honor, so I'll plug it in.

(Pause)

MR. McDANIEL:  I'll see if I can get it better for you.  We'll come back to that.  Okay?

BY MR. McDANIEL:

Q.  But you'll agree with me that there's no frame on your body-worn camera that shows Mr. Simpson with a bottle in his hand; is that right?

A.  Correct.

Q.  And it's after this, even after this, where you say that you're getting out of your vehicle or right before you get out of your vehicle that you actually saw Mr. Simpson with this bottle, correct?

A.  I believe at this point I had already seen it.

Q.  When we asked you or when you were asked on direct, it was when your vehicle came to a stop that you said "there." Do you recall that?

A.  He was playing the video.  So I don't know if I could speak as he was playing the video or -- he was playing the whole video, so I --

Q.  Right.  When you said "there," nobody even asked you a question.  Do you recall that?  You just proclaimed "there." Do you remember that?

A.  The video was being played as I was looking at the screen.

Q.  No, I understand that, sir.  But in terms of how it

happened, the video was just playing, and at some point in time while the video was playing, without him asking you a question, you said "there."  Do you remember that?

A.  I believe he had asked a question, and that's when he was playing the video.

Q.  Okay.  So now it's your testimony that you actually saw the bottle before it is that you were getting out of the vehicle; is that right?

A.  I observed the bottle initially when I was inside the vehicle.

Q.  I get it.  But we're talking about the timing of when it is that you actually saw the bottle.

When you testified earlier today, you said "there" right before, in essence, your door opened.

Now, if you're saying that you saw it before then, that's fine.  Just tell me when it is that you saw it.  I'm going to go back ten seconds.

(Video playing)

A.  There.

MR. McDANIEL:  Okay.  So I stopped it at 22:01:43 seconds.

Q.  You said "there" probably about two seconds before that, so we'll call that 22:01 and 41; is that right?

A.  I don't know what the timing is.

Q.  But you say it was about two seconds that you observed

it?

A.   I observed it as I was driving and Mr. Simpson was sitting on my -- exactly towards my left as I was driving past.

Q.   And you told us earlier today, when I asked you the question, that it was about two seconds that you observed it.

A.   I observed it for about two seconds, yes.

Q.   And it's your testimony, sir, that because you saw that open container of what you believed to be alcohol, that at that point in time you believed that you had both articulable suspicion and probable cause to arrest Mr. Simpson for drinking that open bottle of alcohol; is that right?

A.   I had reasonable suspicion that a crime was being committed.

Q.   Because you had seen him drinking the open bottle of alcohol, right?

A.   I don't think I ever said that he was drinking anything.

Q.   You saw him in possession of the open bottle of what you believed to be wine, right?

A.   I never said the word "wine."

Q.   What did you think that you had articulable suspicion for when you got out of the vehicle?

A.   An open container -- an alcoholic open container.

Q. Okay. So you believed that right when you got out of the vehicle, correct?

A. I had reasonable suspicion to believe that.

Q. That vehicle that we just saw in the middle of the street, that dark vehicle, was that a police vehicle or a civilian vehicle?

A. Can you please replay?

(Video playing)

A. I don't recall.

Q. Okay.

(Video playing)

Q. And that individual that's approaching or with you with what looks like a flashlight, you're saying that that was an individual from maybe a different law enforcement agency?

A. You're referring to the individual on my right side of my BWC?

Q. Correct.

A. Yes.

(Video playing)

Q. That vehicle there that's behind your vehicle with "Police" emblazoned on the side of that, is that an MPD vehicle or a different law enforcement vehicle?

A. It's a different law enforcement vehicle.

Q. Do you know which law enforcement agency that is?

A. Yes.

Q.   What is it?

A.   Secret Service.

Q.   So we have MPD, and then we have Secret Service.  The federal agency?

A.   I believe Secret Service is a federal agency.

Q.   So did Secret Service just happen to be there on that night, or was there some coordination between MPD and the Secret Service?

          MR. HELFAND:  Objection as to relevance.

          THE COURT:  Overruled.

A.   There was coordination.

Q.   So we talked about the number of MPD vehicles that were on the scene.  How many Secret Service vehicles do you think were there?

A.   At least one.

Q.   So here we start to see you shining your light on Mr. Simpson; is that right?

A.   Yes.

Q.   And you're looking at Mr. Simpson -- not only Mr. Simpson.  You end up taking pictures of other civilians who were out there just on the block; is that right?  You do.

A.   I took a photo of an individual that was -- that approached me and got really really close behind my back.

Q.   Okay.

(Video playing)

MR. McDANIEL:  So I'm stopping this at 2:38, and on the counter it is 22:02:20.

Q.  Now, in this frame you see Mr. Simpson, and he's just looking at his phone; is that right?

A.  Correct.

Q.  In review of your body-worn camera, you don't see Mr. Simpson do anything that suggested he's nervous or anything of that nature, do you?

A.  No.

Q.  And then there's this water bottle that's to what would be his right; is that right?

A.  Correct.

Q.  Correct?

Now, we saw Government's Exhibit No. 8, which is where you say that you recovered this bottle of what you believe to be wine or the Sutter Home bottle.  Do you remember that?

A.  I don't know what exhibit it is, but yes, I recall that photo.

Q.  Now, looking under the seat where Mr. Simpson is sitting right now in this frame, you don't see any bottle.  Is that fair to say?

A.  Correct.

Q.  You said that you kept on shining your light on

Mr. Simpson.  You never saw anything on the person of Mr. Simpson that looked like to you to be a gun or L-shaped heavy object, right?

A.  Correct.

(Video playing)

Q.  On direct examination you said that you were waiting for other officers to arrive to give you back-up, which explains this period of time when you're just observing Mr. Simpson.  Do you remember that?

A.  Yes.

Q.  And you agree it's probably about a minute or two that you just start looking at Mr. Simpson.  You don't say anything to him.  Do you remember that?

A.  Yes.

Q.  And when you first say something to Mr. Simpson, you ask him about what you are inquiring about in his satchel; is that right?

That's the first thing you say to him.  How much weed do you have in your satchel?

A.  Yes.

Q.  And in your review of the body-worn camera, you never ask him about any alcohol that he was purportedly drinking, right?

A.  I never asked him if he was drinking, yes.  Correct.

Q.  Right.  So from the time that you get out of the car

when you say you immediately have seen him drinking this bottle of what you believed to be alcohol, you never say anything about it at all while you're on the scene having any conversations with Mr. Simpson.  Is that fair to say?

A.  I never had any conversation with Mr. Simpson before this.

Q.  Or even after.  When you start having a conversation with Mr. Simpson, you never ask him about any open container of alcohol or whether he had alcohol or whether he was drinking alcohol.  You don't ever say anything to him about alcohol at all, correct?

A.  I believe so.

Q.  You believe that you did not, correct?

A.  Correct.

(Video playing)

Q.  Is that the individual that you said kind of snuck up behind you?

A.  Yes.

Q.  So you took a photo of him, right?

A.  I did.

Q.  You took a photo of Mr. Simpson?

A.  Yes.

Q.  Why are you taking photos?

A.  I take a lot of photos on my MPD phone.

Q.  Me, too.  But why are you taking photos of these

individuals who were just on Saratoga, 1400?

A.   I take a lot of photos with my MPD phone.

(Video playing)

Q.   Is it normal for you just to take pictures of people you don't know?

A.   Yes.

(Video playing)

Q.   And so then you ask Mr. Simpson -- let me just be clear about this.  You weren't the only officer out there taking pictures, correct?

A.   Sorry, can you repeat the question?

Q.   You weren't the only officer out there taking pictures of the civilians, correct?

A.   I wasn't aware of anybody else taking pictures.

Q.   You didn't see any other law enforcement officers taking pictures of anybody?

A.   Later, yes.

(Video playing)

Q.   So when Mr. Simpson -- when you asked the question of Mr. Simpson how much did he have, he pulled out this mylar bag; is that right?

A.   Correct.

Q.   And showed it to you, and your testimony was that it was the type of bag that could hold more than the legal amount permissible in the District of Columbia; is that right?

A.  The size, based on my training and experience recovering marijuana from those mylar bags, that bag, it was of the size of a bag that would hold more than two ounces.

Q.  But you didn't know how much weed was in that bag, did you?

A.  That is correct.

Q.  You didn't know if it was the legal amount or the illegal amount, correct?

A.  I suspected that it was over the legal amount based on the --

Q.  Watch my question.  You didn't know whether or not it was the legal amount or the illegal amount, correct?

A.  Based on how the bag looked and based on the size of the bag, based on my training, knowledge, and experience recovering those bags, I suspected that the amount was over the two ounces, which is the legal amount.

Q.  All right.  So let me give you that.  You suspected that.

        You didn't know that; is that right?

A.  Correct.

Q.  Now, when you testified in this matter at the grand jury -- you recall testifying in the grand jury, correct?

A.  Yes.

Q.  And you were asked some questions about what you believed had established the probable cause to arrest

Mr. Simpson.  Do you recall those questions?

A.  I don't recall those specific questions.

Q.  Okay.  Do you recall on September 2, 2025, appearing before the grand jury?

A.  I don't recall the date, but I know I appeared in front of the grand jury.

Q.  All right.  And it was Mr. Helfand that was there who was asking you questions?

A.  Yes.

Q.  And you were asked --

MR. HELFAND:  Objection, Your Honor, as to improper impeachment.

THE COURT:  It's improper impeachment?  I don't know if he's going to --

MR. McDANIEL:  I'll ask the question, and then the Court can see what --

THE COURT:  Very well.  Let me see what the question is.

Q.  At Page 8, Line 24, do you recall this question and your response, sir:

"Okay.  What did you -- and I guess what did -- when you saw him holding the wine bottle, what went through your mind?

"ANSWER:  Well, that's an arrestable offense. That's an open container of alcohol in a public space."

Do you recall providing that answer to that question?

A.   Yes.

Q.   And then later, do you recall Mr. Helfand asking you this question at Line 13, Page 17:

"Okay.   I apologize.   When you told Mr. Simpson that, did you think that" -- maybe I should go up further.

You were talking about the question that you had asked Mr. Simpson and his response regarding the marijuana, and in that context you were asked this question:

"Okay.   I apologize.   When you told Mr. Simpson that, did you think that you had probable cause" --

MR. HELFAND:   Objection, Your Honor.

THE COURT:   Let me hear the question.

Q.   "When you told Mr. Simpson that, did you think that you had probable cause to arrest Mr. Simpson at that point for possession of an open container of alcohol?"

Your answer:   Yes.

Do you recall that?

A.   Yes.

Q.   Now, have you seen your grand jury testimony?

A.   I've read it, yes.

Q.   Okay.   Now, having read that, you agree with me that there's nowhere in your grand jury testimony that you say that you arrested Mr. Simpson because you believed he had an

illegal amount of marijuana.  You never said that in the grand jury, correct?

I can bring it to you.

A.  So you want me to read the whole --

Q.  Well, you said you already read it.  But if you need to review it again, you can read it again.

A.  Okay.  I'll read it again.  What's the question?

Q.  I'm asking you, based upon your recollection of the grand jury that you read and that you participated in, whether you agree that there was nowhere in the grand jury that you said that you arrested Mr. Simpson because you believed he had an illegal amount of marijuana?

A.  (Witness reviews document) I don't know if we touched on that on the grand jury.

Q.  So you agree with me, you never said that at the grand jury, correct?

A.  I don't recall speaking about that on the grand jury.

Q.  Well, you recall talking about the marijuana, don't you?

A.  That was part of the investigation.

Q.  And part of the grand jury.  Page 17.  It starts at Page 16.

Do you recall this question:

"Okay.  And when he opened that bag, his satchel, and you saw the things he was taking out, what observations did you make at that time?

"The size of the bag can hold more than two ounces of marijuana.

"And when you say the size of the bag, you're talking about the white mylar bag that he removed --

"Yes.

-- "from the satchel.

"Yes.  I'm sorry, yes, so the size of the white mylar bag, plastic resealable mylar bag that he pulled out from the satchel, can hold more than two ounces of marijuana."

Do you see that?

A.  Yes.

Q.  You say okay.

MR. McDANIEL:  I'm going to keep playing from 22:04:03.

Q.  "QUESTION" --

MR. McDANIEL:  And I'm going to pause at 22:04:18.

I'm sorry, Madam Reporter.  Let me slow down.

Q.  -- "When you were telling Mr. Simpson we heard I think it was your partner telling Mr. Simpson you're not under arrest, you're just being detained, is that right?

"ANSWER:  Yes, I said that.

"QUESTION:  Was that you?  I'm sorry.

"ANSWER:  That was me.

"Okay.  I apologize.  When you told Mr. Simpson

that, did you think you had probable cause to arrest
Mr. Simpson at that point for possession of an open
container of alcohol?

"Yes."

A.   Yes.

Q.   And there's nowhere in the grand jury testimony where
you say yes, I thought I had probable cause to arrest him
for an open container and marijuana, right?

A.   I don't know if it was part of the conversation, but it
was part of the initial charge.

Q.   That's not what I'm asking you.

A.   Can you be more clear?

     Can you rephrase the question?  I apologize.  I
just want a clear question.

Q.   Right.  So in your review of the grand jury transcript
from your grand jury testimony, there's nowhere in the grand
jury testimony that you say I arrested him based upon
probable cause for an open container and because I believed
he had an illegal amount of marijuana.  You never said that?

A.   At grand jury I answered the questions that were asked
to me.

Q.   So, sir, if you said it, then you would say yes, I said
it.

     If you didn't say it, then you would agree with
me, yes, there's nothing in the grand jury where I say I

arrested him for both an open container and the marijuana.

A.   Mr. Simpson was arrested for multiple offenses.

Q.   Fine.  I'm saying to you that in the grand jury you never said that.

A.   I answered the questions that were asked of me.

Q.   Okay.  You can dodge this any way you want to, right?

In the grand jury you never said that you were arresting him both for the open container and for the marijuana?

A.   I answered the questions that were asked to me.

Q.   So do you just not want to answer the question?

A.   No, unless --

Q.   It's not a hard question.

A.   Unless I need to read the whole eight pages of grand jury.

Q.   So if you need to read it again --

THE COURT:  We'll have to have him read it before we resume because it's 5:00, and we don't have money to pay them overtime.

MR. McDANIEL:  Very well.  I will ask, Your Honor, that, one, there will be no direction or communication between Mr. Helfand and the officer regarding the substance of his testimony, and I'll ask that he read his transcript again.

THE COURT:  Very well.

Since he is in the middle of cross-examination, I will prohibit any discussion between counsel for the government and the witness until we come back.

I don't have any opportunity tomorrow, and Monday it looks like we're not going to be open because of a snow day.  I don't know if it's going to snow or not, but it might.

So my next time I would be available would be 1:30 on Tuesday.  Is that good?

MR. HELFAND:  I believe that works for me, Your Honor.  I believe the officer is scheduled to begin family leave starting tomorrow.

THE COURT:  When are you on leave?

THE WITNESS:  I am on leave.

THE COURT:  Until when?

THE WITNESS:  From tonight at 2000 hours, and I come back on February 9th.

THE COURT:  Unfortunately, that being the case, I am not going to be available until March because I'm away the whole month of February.  So we have no alternative other than to go into March.

I could do it on March 2nd -- that's a Monday -- at 11:30.

You said February 9th?

THE WITNESS:  February the 9th.

THE COURT:  So that's the first time I'll be available.

MR. McDANIEL:  Your Honor, if I could just --

THE COURT:  Is that good?

MR. McDANIEL:  Your Honor, I'm scheduled to be in trial before Judge Bates starting on the 2nd, Monday the 2nd.  I don't think we're sitting on Fridays.

THE COURT:  You're not?

MR. McDANIEL:  No.

THE COURT:  The 6th is not going to be good.  It looks like I'm going to be out of town in New Mexico on Friday, on that 6th.

How long is that trial supposed to last?

MR. McDANIEL:  It's an alleged kidnapping out of Haiti, Your Honor, so it's going to be at least a month.

THE COURT:  So next I could do the 13th.

MR. McDANIEL:  If I could ask the Court --

THE COURT:  (To the law clerk) Well, we're trying to reschedule that sentencing in Pittsburgh.  Do we have a date yet?

THE LAW CLERK:  Not yet.

THE COURT:  Let's tentatively set it for the 13th at 10:30.

I've got to do a sentencing up in Pittsburgh in a case I presided over over there.  If that's the date we have

to set, then we'll have to do it on the 20th.  So it would be one of those two days depending upon when I have to go to Pittsburgh.

MR. McDANIEL:  Very well, Your Honor.

THE COURT:  So keep Pittsburgh.  On the 20th, we could start at 9:30.  On the 13th, we could start at 10:30.

So keep those times open, and we'll hopefully get back to you in the next day or so once we find out in Pittsburgh when the lawyers are going to be available.

MR. McDANIEL:  Very well, Your Honor.  I know my client was hoping that he would have some resolution in this matter sooner.  I don't know if the Court would entertain a motion for modification of his conditions of release at this time?

THE COURT:  Not under the circumstances, no.

MR. McDANIEL:  Thank you.

MR. HELFAND:  If I could just be heard briefly with regard to the timing, Your Honor?  I apologize.

I have a sentencing scheduled at 10:30 before Judge McFadden on the 13th.  We could resume at 9:30?

THE COURT:  How long do you think that's going to be?

MR. HELFAND:  I have a sentencing at 10:30.  It's a co-defendant case so we're doing the first defendant at 10:30 --

THE COURT:  Let's do 1:30.

MR. HELFAND:  That works for me, Your Honor.
Thank you.

THE COURT:  1:30 on the 13th, if we go on the
13th.

And if we do it on the 10th -- the 20th, I mean,
it would be at 9:30.

MR. HELFAND:  Thank you, Your Honor.

THE COURT:  Okay.

(Whereupon the hearing was

adjourned at 5:00 p.m.)


**CERTIFICATE OF OFFICIAL COURT REPORTER**


I, LISA A. MOREIRA, RDR, CRR, do hereby
certify that the above and foregoing constitutes a true and
accurate transcript of my stenographic notes and is a full,
true and complete transcript of the proceedings to the best
of my ability.

Dated this February day of 5th, 2026.


                          /s/Lisa A. Moreira, RDR, CRR
                          Official Court Reporter
                          United States Courthouse
                          Room 6718
                          333 Constitution Avenue, NW
                          Washington, DC 20001

**/**

**/s/Lisa** [1] - 72:22

**1**

**1** [8] - 11:4, 11:5, 11:13, 11:14, 11:21, 12:1, 12:23, 47:20
**10** [4] - 30:23, 30:24, 31:4, 31:9
**1001** [1] - 1:18
**10:30** [5] - 70:23, 71:6, 71:19, 71:23, 71:25
**10th** [1] - 72:6
**11** [4] - 32:17, 32:22, 33:2
**11:30** [1] - 69:23
**12** [5] - 33:8, 33:9, 33:11, 33:18, 33:23
**13** [4] - 33:9, 34:2, 34:3, 64:5
**13th** [6] - 70:16, 70:22, 71:6, 71:20, 72:4, 72:5
**14** [2] - 33:9, 34:7
**1400** [24] - 5:23, 6:9, 6:19, 6:21, 6:25, 7:4, 7:10, 7:21, 8:4, 8:18, 12:25, 23:18, 29:1, 35:14, 44:7, 44:9, 44:16, 45:14, 45:19, 46:3, 49:20, 50:15, 50:17, 61:1
**15** [3] - 33:10, 34:10, 41:3
**16** [4] - 33:10, 34:10, 40:24, 65:21
**17** [8] - 33:10, 33:12, 33:18, 33:23, 34:14, 50:11, 64:5, 65:20
**19** [1] - 37:21
**1:25-cr-00261-RBW-1** [1] - 1:4
**1:30** [3] - 69:8, 72:1, 72:4

**2**

**2** [11] - 28:4, 28:6, 28:10, 28:15, 29:11, 29:16, 29:22, 31:20, 32:4, 32:5, 63:3
**2000** [1] - 69:16
**20001** [2] - 1:23, 72:25
**20003** [1] - 1:18
**20053** [1] - 1:14
**202** [3] - 1:15, 1:19, 1:23
**2020** [3] - 42:12, 43:15, 44:1

**2021** [2] - 41:18, 42:6
**2022** [2] - 41:16, 41:17
**2023** [2] - 40:24, 41:3
**2025** [15] - 5:17, 5:20, 7:13, 10:20, 11:16, 11:22, 28:12, 35:21, 37:15, 37:21, 38:19, 39:20, 49:11, 49:14, 63:3
**2026** [5] - 1:4, 36:12, 36:16, 37:6, 72:20
**20th** [3] - 71:1, 71:5, 72:6
**21** [1] - 37:14
**21:59:40** [1] - 28:5
**21:59:43** [1] - 28:5
**21:59:51** [1] - 11:13
**22** [3] - 1:4, 12:10, 35:21
**22:01** [2] - 50:11, 54:23
**22:01:15** [1] - 12:6
**22:01:19** [1] - 28:19
**22:01:39** [2] - 12:23, 51:6
**22:01:43** [1] - 54:20
**22:01:44** [2] - 14:13, 14:18
**22:01:56** [3] - 14:20, 15:8, 15:14
**22:02:16** [2] - 15:16, 17:21
**22:02:20** [1] - 58:3
**22:02:44** [2] - 17:23, 19:3
**22:03:20** [1] - 28:21
**22:03:38** [4] - 19:5, 20:4, 28:23, 29:12
**22:03:45** [3] - 20:6, 20:15, 20:20
**22:03:46** [1] - 21:19
**22:03:48** [2] - 29:14, 30:1
**22:03:53** [2] - 20:22, 21:8
**22:03:59** [2] - 30:3, 30:11
**22:04:00** [2] - 21:21, 22:13
**22:04:03** [2] - 21:10, 66:15
**22:04:13** [2] - 22:15, 24:2
**22:04:18** [1] - 66:17
**22:04:29** [2] - 24:4, 25:3
**22:04:34** [4] - 25:5, 25:19, 30:13, 31:22
**22:04:45** [1] - 25:21
**22:04:57** [1] - 31:24

**22:05:14** [1] - 32:1
**22:05:46** [1] - 26:10
**22:05:49** [2] - 26:12, 26:16
**22:05:53** [1] - 26:21
**22nd** [14] - 5:17, 5:20, 7:12, 7:22, 8:5, 10:19, 10:24, 11:16, 11:22, 18:11, 26:1, 27:7, 28:12, 32:24
**24** [1] - 63:19
**24/7** [2] - 44:21, 44:23
**25** [1] - 7:9
**25-261** [1] - 3:3
**252-7059** [1] - 1:15
**2:38** [1] - 58:2
**2nd** [3] - 69:22, 70:6, 70:7

**3**

**3** [3] - 36:12, 36:16, 37:6
**331-0793** [1] - 1:19
**333** [2] - 1:22, 72:24
**354-3187** [1] - 1:23
**3:13** [1] - 1:5
**3rd** [2] - 42:12, 43:14

**4**

**41** [1] - 54:23

**5**

**5:00** [2] - 68:18, 72:11
**5th** [1] - 72:20

**6**

**601** [1] - 1:14
**6718** [2] - 1:22, 72:24
**6th** [2] - 70:10, 70:12

**7**

**7th** [1] - 44:1

**8**

**8** [5] - 27:1, 27:2, 27:11, 58:15, 63:19
**8/22/2025** [1] - 49:15

**9**

**911** [1] - 44:15
**9:30** [3] - 71:6, 71:20, 72:7
**9th** [3] - 69:17, 69:24, 69:25

**A**

**ability** [1] - 72:19
**able** [11] - 8:25, 12:12, 13:3, 13:9, 13:12, 13:23, 14:6, 19:21, 24:17, 30:8, 52:1
**accident** [6] - 44:2, 44:4, 45:13, 45:15, 45:16, 45:20
**accidentally** [1] - 41:25
**accurate** [1] - 72:17
**accurately** [6] - 11:21, 27:6, 28:10, 31:4, 32:22, 33:19
**acting** [5] - 48:17, 48:20, 48:24, 48:25, 49:2
**Action** [1] - 1:3
**activate** [1] - 41:7
**activity** [4] - 8:14, 9:4, 47:16, 49:5
**actual** [1] - 14:1
**ADAM** [1] - 1:13
**addition** [1] - 45:1
**additional** [4] - 24:19, 24:22, 34:12, 43:1
**adjourned** [1] - 72:11
**admission** [6] - 11:25, 27:10, 28:14, 31:8, 33:1, 33:22
**admit** [1] - 33:7
**admitted** [6] - 12:4, 27:14, 28:17, 31:11, 33:4, 34:1
**afternoon** [7] - 3:7, 3:9, 3:10, 3:13, 4:4, 35:5, 35:6
**age** [2] - 42:18, 42:25
**agency** [4] - 56:14, 56:24, 57:4, 57:5
**agree** [6] - 53:5, 59:11, 64:23, 65:10, 65:15, 67:24
**agreed** [1] - 45:21
**agreeing** [1] - 40:20
**agreement** [1] - 46:2
**alcohol** [35] - 8:11, 9:8, 9:10, 9:12, 9:17, 9:18, 9:21, 9:25, 10:8, 10:11, 10:14, 14:7, 14:17, 15:5, 15:19, 15:23, 16:6, 16:10, 16:20, 17:4, 17:7, 22:23, 26:19, 55:10, 55:13, 55:18, 59:22, 60:2, 60:9, 60:10, 60:11, 63:25, 64:17, 67:3

**alcoholic** [3] - 16:15, 16:16, 55:25
**allegation** [4] - 36:17, 38:1, 38:22, 41:19
**allegations** [3] - 38:10, 40:16, 40:18
**alleged** [2] - 36:12, 70:14
**allow** [2] - 39:1, 39:6
**allowed** [1] - 39:14
**almost** [1] - 23:25
**alternative** [1] - 69:20
**America** [1] - 3:3
**AMERICA** [1] - 1:3
**amount** [12] - 23:1, 61:24, 62:7, 62:8, 62:9, 62:12, 62:15, 62:16, 65:1, 65:12, 67:19
**announced** [1] - 25:22
**answer** [5] - 44:24, 45:24, 64:1, 64:18, 68:11
**ANSWER** [3] - 63:24, 66:22, 66:24
**answered** [5] - 39:17, 46:5, 67:20, 68:5, 68:10
**Antwain** [2] - 3:3, 14:24
**ANTWAIN** [1] - 1:6
**apart** [1] - 17:14
**apologize** [5] - 64:6, 64:11, 66:25, 67:13, 71:18
**appearance** [1] - 3:5
**APPEARANCES** [1] - 1:12
**appeared** [4] - 45:2, 45:19, 46:2, 63:5
**appearing** [1] - 63:3
**approach** [5] - 3:4, 18:16, 36:22, 42:23, 46:16
**approached** [2] - 15:18, 57:24
**approaching** [2] - 50:15, 56:12
**approximate** [2] - 6:22, 7:5
**area** [11] - 6:2, 6:5, 7:8, 8:10, 13:7, 13:13, 18:8, 19:10, 19:11, 46:8, 51:23
**Armed** [1] - 5:10
**armed** [2] - 41:23, 41:24
**arrest** [15] - 4:25, 23:14, 23:15, 23:19, 30:15, 35:15, 35:17,

41:12, 49:12, 55:12, 62:25, 64:16, 66:21, 67:1, 67:7

**arrestable** [1] - 63:24

**arrested** [9] - 44:12, 49:14, 49:15, 49:17, 64:25, 65:11, 67:17, 68:1, 68:2

**arresting** [1] - 68:8

**arrests** [7] - 6:7, 6:21, 7:4, 7:6, 7:9, 23:17, 35:13

**arrive** [3] - 47:2, 47:3, 59:7

**arrived** [4] - 44:19, 45:3, 45:13, 46:23

**articulable** [4] - 49:6, 49:7, 55:12, 55:23

**as..** [1] - 5:14

**assaults** [1] - 23:23

**assigned** [2] - 4:15, 5:23

**assignment** [1] - 4:13

**attention** [3] - 8:8, 13:6, 13:20

**ATTORNEY'S** [1] - 1:13

**August** [19] - 5:17, 5:20, 7:12, 7:22, 8:5, 10:19, 10:24, 11:16, 11:22, 18:11, 26:1, 27:7, 28:11, 32:24, 35:21, 41:3, 49:11, 49:14

**available** [4] - 69:8, 69:19, 70:2, 71:9

**Avenue** [14] - 1:22, 5:24, 6:9, 6:19, 6:21, 6:25, 7:4, 7:11, 7:21, 8:5, 13:1, 23:18, 29:2, 72:24

**aware** [1] - 61:14

## B

**back-up** [1] - 59:7

**bad** [1] - 9:15

**bag** [31] - 19:21, 19:24, 20:10, 20:14, 21:1, 21:6, 21:24, 22:1, 22:24, 22:25, 23:3, 23:5, 24:9, 24:14, 30:7, 34:4, 34:9, 61:21, 61:24, 62:2, 62:3, 62:4, 62:13, 62:14, 65:23, 66:1, 66:3, 66:4, 66:8

**bags** [14] - 19:22, 20:1, 20:2, 21:4,

24:19, 24:20, 24:22, 24:24, 25:1, 34:12, 62:2, 62:15

**base** [1] - 34:22

**based** [16] - 16:11, 19:25, 21:3, 22:8, 22:24, 23:20, 24:21, 24:24, 35:24, 62:1, 62:9, 62:13, 62:14, 65:8, 67:17

**basis** [3] - 6:11, 38:15, 42:16

**Bates** [1] - 70:6

**BEFORE** [1] - 1:10

**began** [1] - 41:10

**begin** [2] - 12:6, 69:11

**beginning** [3] - 3:5, 11:12, 28:4

**behalf** [1] - 3:11

**behind** [7] - 29:22, 47:7, 47:9, 50:11, 56:20, 57:24, 60:17

**Benjamin** [1] - 3:7

**BENJAMIN** [1] - 1:13

**benjamin.helfand@ usdoj.gov** [1] - 1:15

**best** [4] - 8:1, 11:23, 31:6, 72:18

**better** [3] - 52:22, 52:24, 53:2

**between** [4] - 46:2, 57:7, 68:22, 69:2

**beverage** [2] - 16:15, 16:17

**bias** [1] - 43:1

**bit** [1] - 28:19

**bkmassociates@aol. com** [1] - 1:19

**blading** [3] - 5:15, 48:1, 48:4

**block** [41] - 5:23, 6:9, 6:15, 6:18, 6:19, 6:21, 6:25, 7:4, 7:10, 7:21, 8:4, 8:18, 12:25, 23:18, 23:20, 23:23, 29:1, 35:14, 44:7, 44:9, 44:16, 44:17, 44:20, 44:21, 44:25, 45:2, 45:3, 45:9, 45:11, 45:14, 45:19, 46:3, 46:16, 46:23, 47:3, 47:16, 49:20, 50:4, 50:15, 50:17, 57:21

**blocking** [1] - 9:3

**blocks** [1] - 23:21

**blue** [5] - 51:17, 51:18, 51:19, 52:2

**body** [26] - 5:12, 5:15, 10:19, 10:23, 11:16,

17:21, 18:14, 24:5, 25:6, 26:18, 27:22, 27:25, 28:8, 28:11, 30:5, 41:8, 41:11, 43:17, 47:6, 47:21, 48:19, 48:23, 50:10, 53:6, 58:7, 59:21

**body-worn** [22] - 10:19, 10:23, 11:16, 17:21, 18:14, 24:5, 25:6, 26:18, 27:22, 27:25, 28:8, 28:11, 30:5, 41:8, 41:11, 43:17, 47:6, 47:21, 50:10, 53:6, 58:7, 59:21

**bottle** [35] - 16:22, 17:4, 17:7, 17:8, 17:10, 17:13, 26:6, 26:8, 26:14, 26:19, 26:22, 27:5, 27:7, 27:15, 27:19, 29:4, 29:15, 50:7, 50:21, 51:3, 53:6, 53:12, 54:7, 54:9, 54:12, 55:13, 55:17, 55:20, 58:11, 58:16, 58:17, 58:22, 60:2, 63:22

**bottles** [1] - 16:12

**bottom** [2] - 29:21, 52:11

**break** [1] - 12:18

**Brian** [1] - 3:11

**BRIAN** [1] - 1:17

**brief** [1] - 34:23

**briefly** [3] - 25:18, 31:21, 71:17

**bring** [5] - 11:3, 12:5, 26:25, 28:21, 65:3

**bulk** [1] - 33:7

**BWC** [3] - 18:22, 52:17, 56:16

**BY** [5] - 4:3, 12:24, 15:17, 35:4, 53:4

## C

**camera** [22] - 10:19, 10:23, 11:16, 17:21, 18:14, 24:5, 25:6, 26:18, 27:22, 27:25, 28:8, 28:11, 30:5, 41:8, 41:11, 43:17, 47:6, 47:21, 50:10, 53:6, 58:7, 59:21

**cap** [3] - 17:8, 17:10, 17:19

**capacity** [1] - 39:19

**car** [4] - 7:24, 16:8, 50:6, 59:25

**carry** [1] - 22:9

**case** [3] - 69:18, 70:25, 71:24

**cases** [1] - 38:25

**caught** [2] - 13:6, 13:20

**certain** [3] - 5:16, 48:12

**CERTIFICATE** [1] - 72:13

**certify** [1] - 72:16

**chair** [12] - 9:22, 15:24, 16:4, 16:7, 27:16, 27:17, 29:3, 29:5, 29:19, 29:23, 51:24, 52:1

**chairs** [3] - 8:20, 9:2, 13:5

**characteristics** [4] - 5:6, 5:11, 48:19, 48:22

**Characteristics** [1] - 5:10

**charge** [1] - 67:10

**check** [1] - 15:9

**circle** [1] - 13:8

**circumstances** [1] - 71:15

**citizens** [1] - 5:2

**city** [1] - 8:8

**civilian** [2] - 38:1, 56:6

**civilians** [2] - 57:20, 61:13

**class** [1] - 5:9

**clear** [4] - 47:15, 61:8, 67:12, 67:14

**clearly** [1] - 7:17

**clerk** [1] - 70:18

**CLERK** [1] - 70:21

**client** [1] - 71:11

**clip** [4] - 28:24, 29:6, 30:5, 32:6

**close** [4] - 18:3, 18:24, 52:12, 57:24

**closed** [6] - 19:16, 34:6, 38:3, 38:4, 38:8, 38:17

**closer** [2] - 16:1, 18:5

**co** [1] - 71:24

**co-defendant** [1] - 71:24

**cocaine** [1] - 34:22

**code** [2] - 25:15, 25:23

**color** [3] - 17:11, 17:19, 19:21

**colorful** [3] - 17:8, 17:9, 17:10

**Columbia** [2] - 5:25, 61:25

**COLUMBIA** [1] - 1:1

**comfortable** [1] - 18:20

**committed** [1] - 55:16

**communicated** [1] - 46:15

**communication** [1] - 68:21

**community** [1] - 35:13

**complaint** [4] - 36:6, 36:7, 36:16, 37:18

**complaints** [4] - 5:2, 35:24, 36:14, 42:18

**complete** [1] - 72:18

**computer** [1] - 52:22

**concepts** [3] - 49:6, 49:18

**conclusion** [1] - 32:3

**conditions** [1] - 71:13

**conducted** [1] - 25:10

**conducting** [1] - 25:8

**confirming** [1] - 15:2

**connection** [4] - 35:24, 37:10, 41:12, 48:1

**constitutes** [1] - 72:16

**Constitution** [2] - 1:22, 72:24

**contact** [1] - 35:13

**contained** [1] - 25:1

**container** [32] - 9:8, 9:10, 9:12, 9:17, 9:18, 9:21, 9:25, 10:7, 10:11, 10:13, 14:7, 14:16, 15:5, 15:19, 15:22, 16:6, 16:10, 16:19, 16:21, 22:23, 26:19, 55:10, 55:25, 60:8, 63:25, 64:17, 67:3, 67:8, 67:18, 68:1, 68:8

**containers** [1] - 8:11

**context** [1] - 64:10

**continue** [24] - 14:4, 14:9, 14:18, 15:8, 15:14, 17:20, 19:3, 20:3, 20:20, 21:7, 22:13, 24:2, 25:2, 25:18, 26:10, 26:16, 29:10, 29:11, 29:25, 30:11, 31:21, 39:1, 39:6, 39:15

**conversation** [4] - 46:18, 60:5, 60:7, 67:9

**conversations** [1] - 60:4

**coordinated** [2] - 45:10, 45:15

**coordination** [2] - 57:7, 57:11

**corner** [2] - 20:13, 34:4
**correct** [54] - 4:18, 14:1, 15:7, 17:4, 17:14, 17:25, 20:11, 29:7, 35:16, 36:1, 36:9, 36:10, 37:10, 39:12, 39:13, 41:8, 44:7, 44:13, 44:14, 44:20, 45:3, 45:4, 45:7, 45:14, 45:20, 47:4, 47:5, 47:8, 47:18, 48:11, 50:12, 53:8, 53:12, 56:2, 56:17, 58:6, 58:13, 58:24, 59:4, 59:24, 60:11, 60:13, 60:14, 61:10, 61:13, 61:22, 62:6, 62:8, 62:12, 62:20, 62:22, 65:2, 65:16
**Correct** [1] - 58:14
**counsel** [4] - 3:4, 40:6, 52:20, 69:2
**Counsel** [2] - 3:22, 12:12
**counsel's** [1] - 3:12
**counter** [1] - 58:3
**COURT** [71] - 1:1, 3:9, 3:13, 3:18, 3:21, 4:17, 6:11, 6:16, 9:9, 10:4, 12:2, 12:4, 12:11, 12:15, 12:18, 12:21, 13:18, 15:9, 15:12, 16:25, 17:9, 17:17, 21:15, 27:12, 27:14, 28:17, 31:11, 31:14, 31:19, 33:4, 33:24, 34:1, 35:1, 36:23, 38:13, 38:15, 38:18, 39:4, 39:18, 40:14, 41:22, 42:16, 42:20, 43:3, 43:9, 46:7, 46:20, 51:14, 57:10, 63:13, 63:17, 64:14, 68:17, 68:25, 69:13, 69:15, 69:18, 70:1, 70:4, 70:8, 70:10, 70:16, 70:18, 70:22, 71:5, 71:15, 71:21, 72:1, 72:4, 72:9, 72:13
**Court** [7] - 1:21, 1:21, 3:11, 63:16, 70:17, 71:12, 72:23
**Court's** [1] - 51:13
**Courthouse** [2] - 1:22, 72:23
**COURTROOM** [1] - 3:2

**cover** [1] - 44:22
**crime** [11] - 4:15, 4:19, 4:20, 5:4, 5:8, 6:5, 18:18, 18:23, 18:25, 25:16, 55:15
**Criminal** [2] - 1:3, 3:2
**cross** [3] - 35:1, 43:2, 69:1
**CROSS** [1] - 35:3
**cross-examination** [2] - 35:1, 69:1
**CROSS-EXAMINATION** [1] - 35:3
**CRR** [3] - 1:21, 72:15, 72:22
**cruiser** [4] - 10:12, 13:21, 13:22, 14:3
**cruisers** [1] - 44:23
**current** [1] - 4:13
**curry** [3] - 42:17, 42:19, 43:1

**D**

**D.C** [1] - 1:13
**dark** [1] - 56:5
**DARRELL** [1] - 1:6
**date** [7] - 35:14, 35:17, 35:19, 35:20, 63:5, 70:20, 70:25
**Dated** [1] - 72:20
**days** [1] - 71:2
**DC** [4] - 1:14, 1:18, 1:23, 72:25
**defendant** [2] - 71:24
**Defendant** [2] - 1:7, 1:17
**defense** [1] - 3:18
**degree** [1] - 43:6
**Department** [3] - 4:10, 4:14, 5:5
**department** [1] - 41:15
**depict** [6] - 11:22, 27:6, 28:10, 31:5, 32:23, 33:19
**depicts** [1] - 34:8
**DEPUTY** [1] - 3:2
**describe** [3] - 13:19, 16:20, 21:18
**described** [5] - 9:3, 13:4, 17:13, 48:8, 48:13
**describing** [1] - 29:21
**detain** [1] - 22:18
**detained** [3] - 23:14, 23:16, 66:21
**detention** [1] - 23:19
**determine** [1] - 9:11
**determined** [1] - 14:24

**different** [7] - 16:24, 35:13, 35:23, 43:25, 56:14, 56:22, 56:23
**digitally** [1] - 31:18
**DIRECT** [1] - 4:2
**direct** [3] - 50:25, 53:14, 59:6
**direction** [1] - 68:21
**disagreeing** [2] - 40:20, 40:22
**disclosed** [3] - 41:1, 41:2, 43:22
**discussion** [2] - 45:9, 69:2
**distribution** [1] - 7:7
**District** [12] - 4:16, 4:17, 4:18, 4:21, 5:24, 6:1, 25:16, 35:10, 44:6, 44:10, 46:9, 61:25
**DISTRICT** [3] - 1:1, 1:1, 1:10
**document** [2] - 37:8, 65:13
**documentation** [1] - 42:3
**dodge** [1] - 68:6
**done** [1] - 4:11
**door** [1] - 54:14
**down** [3] - 16:3, 16:6, 66:18
**draw** [2] - 13:12, 13:13
**dressed** [1] - 7:15
**drinking** [7] - 55:13, 55:17, 55:19, 59:22, 59:24, 60:1, 60:10
**drive** [1] - 8:4
**driver** [1] - 49:22
**driving** [4] - 7:13, 49:21, 55:2, 55:3
**drove** [5] - 7:21, 8:3, 8:7, 44:16, 50:4
**drugs** [1] - 6:25
**during** [1] - 25:9
**duties** [1] - 49:5

**E**

**effort** [1] - 45:10
**eight** [7] - 4:12, 25:13, 25:25, 35:8, 38:7, 44:6, 68:14
**emblazoned** [1] - 56:21
**end** [2] - 32:6, 57:20
**enforcement** [14] - 18:10, 18:17, 23:21, 45:10, 46:22, 47:11, 47:13, 48:5, 49:5, 56:14, 56:22, 56:23,

56:24, 61:15
**engaged** [1] - 9:4
**entered** [1] - 49:20
**entertain** [1] - 71:12
**ESQ** [2] - 1:13, 1:17
**essence** [1] - 54:14
**established** [4] - 9:5, 9:7, 22:22, 62:25
**estimate** [1] - 38:9
**evening** [3] - 5:20, 7:13, 45:11
**event** [1] - 52:9
**events** [1] - 11:22
**eventually** [1] - 19:1
**evidence** [6] - 12:1, 27:11, 28:15, 31:9, 33:2, 33:23
**EVIDENTIARY** [1] - 1:9
**exactly** [1] - 55:3
**EXAMINATION** [2] - 4:2, 35:3
**examination** [4] - 35:1, 51:1, 59:6, 69:1
**excessive** [1] - 41:19
**excuse** [2] - 28:20, 38:15
**Exhibit** [36] - 11:4, 11:5, 11:13, 11:14, 11:21, 12:1, 12:23, 27:1, 27:2, 27:11, 28:4, 28:6, 28:10, 28:15, 29:11, 29:16, 29:22, 30:23, 30:24, 31:4, 31:9, 31:20, 32:4, 32:5, 32:16, 32:17, 32:22, 33:2, 33:8, 34:2, 34:3, 34:7, 34:14, 47:20, 58:15
**exhibit** [1] - 58:19
**exhibits** [1] - 33:5
**Exhibits** [5] - 33:9, 33:11, 33:18, 33:23, 34:10
**existence** [1] - 38:17
**exit** [1] - 16:8
**experience** [11] - 16:11, 19:25, 21:3, 22:8, 22:25, 23:20, 24:21, 24:25, 52:8, 62:1, 62:14
**explains** [1] - 59:7
**extending** [1] - 19:17

**F**

**fact** [7] - 39:11, 39:14, 40:11, 40:14, 40:15,

42:24, 45:18
**failed** [1] - 41:5
**failure** [2] - 41:7, 43:17
**fair** [4] - 29:20, 45:11, 58:23, 60:4
**fairly** [6] - 11:21, 27:6, 28:10, 31:4, 32:22, 33:18
**familiar** [3] - 37:14, 37:21, 49:17
**families** [1] - 8:24
**family** [1] - 69:11
**favor** [3] - 42:18, 42:19, 43:1
**February** [6] - 41:18, 69:17, 69:20, 69:24, 69:25, 72:20
**federal** [2] - 57:4, 57:5
**felt** [1] - 30:18
**few** [3] - 11:9, 28:5, 33:5
**field** [2] - 34:18, 34:20
**field-tested** [1] - 34:18
**Fifth** [10] - 4:16, 4:17, 4:18, 4:21, 6:1, 25:16, 35:10, 44:6, 44:10, 46:8
**fighting** [1] - 41:23
**figure** [1] - 26:2
**finally** [1] - 34:14
**fine** [3] - 45:25, 54:16, 68:3
**finger** [1] - 13:13
**finished** [1] - 43:13
**firearm** [16] - 5:7, 6:14, 6:18, 6:20, 22:12, 25:17, 30:18, 30:19, 31:3, 32:8, 32:10, 32:20, 32:23, 38:23, 41:25, 42:6
**firearms** [3] - 5:1, 6:8, 22:9
**first** [9] - 3:22, 4:6, 8:18, 9:24, 33:8, 59:15, 59:18, 70:1, 71:24
**five** [1] - 41:23
**fixed** [1] - 12:19
**flashlight** [6] - 14:21, 14:23, 15:1, 19:6, 19:9, 56:13
**focused** [1] - 5:12
**fold** [3] - 22:6, 22:7, 22:11
**footage** [1] - 10:23
**FOR** [2] - 1:1, 1:13
**force** [6] - 23:22, 35:7, 36:8, 36:13, 37:9, 41:19
**forefinger** [1] - 17:14

**foregoing** [1] - 72:16
**formatting** [1] - 43:23
**forward** [5] - 12:5, 13:17, 22:18, 31:25
**frame** [4] - 52:11, 53:5, 58:4, 58:22
**free** [1] - 8:20
**frequently** [1] - 6:2
**Friday** [1] - 70:12
**Fridays** [1] - 70:7
**front** [3] - 11:5, 11:8, 63:5
**full** [2] - 39:19, 72:17
**fully** [1] - 34:6
**future** [1] - 31:16

# G

**general** [2] - 13:7, 38:17
**generally** [1] - 33:14
**given** [2] - 6:14, 42:25
**government** [6] - 3:6, 3:16, 3:22, 3:25, 52:20, 69:3
**Government** [35] - 11:5, 11:13, 11:14, 11:21, 12:1, 12:23, 26:25, 27:2, 27:11, 28:4, 28:6, 28:10, 28:15, 29:11, 29:16, 29:22, 30:23, 30:24, 31:4, 31:9, 32:4, 32:5, 32:16, 32:17, 32:22, 33:2, 33:8, 33:9, 33:18, 34:2, 34:3, 34:7, 34:10, 34:14
**Government's** [5] - 11:4, 33:11, 33:23, 47:20, 58:15
**grand** [22] - 62:21, 62:22, 63:4, 63:6, 64:21, 64:24, 65:2, 65:9, 65:10, 65:14, 65:15, 65:17, 65:20, 67:6, 67:15, 67:16, 67:20, 67:25, 68:3, 68:7, 68:14
**gray** [1] - 51:10
**green** [1] - 34:9
**ground** [5] - 16:3, 26:14, 29:5, 29:19, 52:13
**group** [4] - 8:17, 9:2, 33:7, 48:21
**GROUP** [1] - 1:17
**guess** [1] - 63:21
**gun** [2] - 25:23, 59:2

# H

**Haiti** [1] - 70:15
**hand** [4] - 13:25, 51:3, 52:15, 53:7
**handcuff** [1] - 22:18
**handcuffs** [5] - 22:21, 23:8, 23:13, 30:15, 36:19
**handle** [2] - 13:24, 14:3
**hands** [1] - 50:21
**harassment** [3] - 36:12, 37:9, 38:20
**hard** [2] - 22:11, 68:13
**Harleston** [9] - 7:25, 20:19, 24:5, 27:23, 30:14, 31:2, 31:5, 32:7, 50:1
**Harleston's** [2] - 28:8, 28:11
**hear** [4] - 16:2, 42:20, 64:14
**heard** [3] - 20:7, 66:19, 71:17
**hearing** [3] - 3:15, 31:18, 72:10
**HEARING** [1] - 1:9
**heavy** [1] - 59:3
**held** [1] - 17:13
**HELD** [1] - 1:10
**Helfand** [4] - 3:8, 63:7, 64:4, 68:22
**HELFAND** [91] - 1:13, 3:7, 3:17, 3:24, 4:3, 6:13, 10:6, 11:3, 11:25, 12:5, 12:9, 12:22, 12:24, 13:16, 14:4, 14:12, 14:18, 14:20, 15:8, 15:13, 15:16, 15:17, 17:1, 17:20, 17:23, 19:3, 19:5, 20:3, 20:6, 20:20, 20:22, 21:7, 21:10, 21:16, 21:21, 22:13, 22:15, 24:2, 24:4, 25:2, 25:5, 25:18, 25:21, 26:10, 26:12, 26:16, 26:20, 26:25, 27:10, 28:3, 28:14, 28:18, 28:23, 29:10, 29:14, 29:25, 30:3, 30:11, 30:13, 30:22, 31:8, 31:13, 31:17, 31:20, 31:24, 32:3, 33:1, 33:5, 33:22, 34:23, 34:25, 38:12, 38:14, 38:16, 39:3, 39:17, 40:12, 41:21, 42:15, 42:17, 42:22, 46:5, 46:19, 57:9, 63:11, 64:13, 69:10, 71:17, 71:23, 72:2, 72:8
**Helfand)....................
..............4** [1] - 2:4
**help** [1] - 11:9
**hereby** [1] - 72:15
**hold** [8] - 20:2, 22:25, 23:4, 24:25, 61:24, 62:3, 66:1, 66:9
**holding** [15] - 9:24, 10:7, 10:11, 10:13, 15:19, 15:23, 16:10, 16:19, 17:4, 17:7, 22:23, 29:15, 34:5, 63:22
**Home** [1] - 58:17
**Honor** [41] - 3:7, 3:10, 3:17, 3:20, 3:24, 6:12, 6:13, 10:3, 12:1, 13:16, 15:13, 16:23, 21:13, 27:11, 27:13, 28:15, 31:13, 31:17, 34:23, 35:2, 36:22, 38:12, 39:3, 40:13, 42:15, 42:22, 43:4, 46:6, 52:25, 63:11, 64:13, 68:20, 69:11, 70:3, 70:5, 70:15, 71:4, 71:10, 71:18, 72:2, 72:8
**HONORABLE** [1] - 1:10
**hopefully** [1] - 71:7
**hoping** [1] - 71:11
**hot** [1] - 44:21
**hours** [1] - 69:16

# I

**identification** [1] - 11:4
**identify** [1] - 7:17
**illegal** [21] - 5:1, 6:8, 6:18, 6:20, 6:24, 7:2, 7:3, 7:6, 7:7, 8:11, 8:14, 9:4, 22:9, 22:12, 41:25, 47:15, 62:8, 62:12, 65:1, 65:12, 67:19
**immediately** [1] - 60:1
**impeachment** [2] - 63:12, 63:13
**impeding** [1] - 8:20
**improper** [3] - 43:2, 63:12, 63:13
**IN** [1] - 1:1
**inaccurate** [2] - 39:24, 40:2

**incident** [1] - 36:12
**include** [1] - 48:16
**incorrect** [1] - 40:11
**indication** [1] - 48:13
**individual** [23] - 5:6, 9:13, 14:7, 14:16, 18:21, 23:2, 25:17, 36:18, 41:12, 41:23, 41:24, 48:12, 51:9, 51:15, 51:18, 52:2, 52:10, 52:14, 56:12, 56:14, 56:15, 57:23, 60:16
**individuals** [15] - 8:17, 8:19, 13:4, 13:5, 13:9, 13:20, 22:9, 28:25, 38:11, 47:25, 48:17, 48:20, 48:22, 48:25, 61:1
**Individuals** [1] - 5:10
**indulgence** [1] - 34:23
**information** [1] - 40:1
**infraction** [1] - 8:11
**initial** [1] - 67:10
**inquiring** [1] - 59:16
**inside** [10] - 19:22, 20:14, 21:25, 24:19, 25:1, 30:8, 33:17, 34:9, 34:17, 54:9
**interacting** [1] - 48:9
**interior** [1] - 13:23
**internal** [1] - 36:7
**introduce** [1] - 4:4
**investigate** [1] - 18:6
**investigating** [1] - 47:25
**investigation** [7] - 36:2, 36:8, 37:15, 37:22, 41:14, 42:1, 65:19
**investigations** [15] - 4:25, 5:1, 5:3, 6:7, 7:3, 23:18, 35:13, 35:24, 38:17, 39:5, 39:16, 40:5, 40:7, 40:8, 40:18
**involve** [1] - 38:10
**involved** [5] - 7:2, 23:17, 23:22, 35:12, 44:5
**involving** [1] - 36:12
**items** [2] - 33:16, 33:19

# J

**January** [5] - 1:4, 36:12, 36:16, 37:6, 42:6
**job** [5] - 45:15, 45:16,

45:18, 45:23, 46:8
**Judge** [2] - 70:6, 71:20
**JUDGE** [1] - 1:10
**July** [1] - 38:19
**June** [1] - 39:20
**jury** [22] - 62:22, 63:4, 63:6, 64:21, 64:24, 65:2, 65:9, 65:10, 65:14, 65:16, 65:17, 65:20, 67:6, 67:15, 67:16, 67:17, 67:20, 67:25, 68:3, 68:7, 68:15
**justification** [1] - 37:19

# K

**keep** [4] - 13:17, 66:14, 71:5, 71:7
**KEITH** [1] - 1:17
**kept** [1] - 58:25
**kidnapping** [1] - 70:14
**kids** [1] - 8:24
**kind** [5] - 8:10, 16:9, 16:16, 47:13, 60:16
**kinds** [1] - 21:4
**knowledge** [7] - 19:25, 21:3, 22:8, 22:25, 24:24, 31:6, 62:14

# L

**L-shaped** [1] - 59:2
**language** [3] - 5:13, 48:19, 48:23
**last** [4] - 33:5, 36:4, 37:3, 70:13
**latest** [1] - 36:2
**law** [15] - 18:10, 18:17, 23:21, 45:10, 46:22, 47:11, 47:13, 48:4, 49:5, 56:14, 56:22, 56:23, 56:24, 61:15, 70:18
**LAW** [2] - 1:17, 70:21
**lawn** [8] - 8:19, 9:22, 15:24, 16:4, 16:7, 29:3, 29:5, 29:19
**lawyers** [1] - 71:9
**leading** [2] - 10:3, 21:14
**leafy** [1] - 34:9
**learned** [1] - 49:4
**least** [5] - 38:1, 38:7, 47:1, 57:15, 70:15
**leave** [3] - 69:12, 69:13, 69:14
**lectern** [1] - 3:4
**led** [1] - 9:6
**left** [16] - 8:17, 9:22,

13:21, 13:25, 14:2, 15:24, 16:3, 16:6, 26:15, 29:1, 29:5, 29:9, 29:19, 51:9, 51:22, 55:3
**left-hand** [1] - 13:25
**legal** [7] - 23:1, 49:18, 61:24, 62:7, 62:9, 62:12, 62:16
**legs** [1] - 29:22
**light** [6] - 51:17, 51:18, 51:19, 52:10, 57:16, 58:25
**lights** [1] - 44:22
**likely** [1] - 42:18
**Line** [2] - 63:19, 64:5
**liquor** [1] - 50:7
**LISA** [1] - 72:15
**Lisa** [1] - 1:21
**listen** [1] - 45:24
**located** [2] - 13:5, 13:9
**lone** [1] - 43:6
**long-term** [2] - 5:2, 6:7
**look** [9] - 5:1, 5:11, 24:18, 47:24, 48:17, 48:19, 48:22, 48:25, 51:22
**looked** [6] - 16:22, 17:12, 17:17, 43:25, 59:2, 62:13
**looking** [15] - 5:15, 8:7, 19:8, 19:10, 21:5, 21:24, 48:8, 48:9, 50:25, 52:14, 53:23, 57:19, 58:5, 58:21, 59:12
**looks** [6] - 17:24, 37:15, 52:9, 56:13, 69:5, 70:11

### M

**M-A-N-U-E-L** [1] - 4:7
**Madam** [1] - 66:18
**Malik** [2] - 27:23, 28:8
**manage** [1] - 26:2
**manipulating** [2] - 21:4, 31:3
**MANUEL** [2] - 2:3, 4:1
**Manuel** [2] - 3:25, 4:7
**March** [5] - 41:16, 41:17, 69:19, 69:21, 69:22
**marijuana** [17] - 8:12, 20:2, 23:4, 23:5, 24:25, 25:1, 62:2, 64:9, 65:1, 65:12, 65:18, 66:2, 66:10, 67:8, 67:19, 68:1, 68:9

**mark** [4] - 11:4, 28:3, 30:23, 32:16
**marked** [4] - 7:13, 31:15, 47:19, 49:22
**Matter** [1] - 3:2
**matter** [6] - 3:14, 36:6, 39:11, 43:6, 62:21, 71:12
**MCDANIEL** [2] - 1:17, 1:17
**McDaniel** [38] - 3:10, 3:11, 3:20, 6:10, 6:12, 10:3, 12:3, 12:13, 16:23, 21:13, 27:13, 28:16, 31:10, 33:3, 33:25, 35:2, 35:4, 36:22, 40:15, 43:4, 51:13, 52:24, 53:2, 53:4, 54:20, 58:2, 63:15, 66:14, 66:17, 68:20, 70:3, 70:5, 70:9, 70:14, 70:17, 71:4, 71:10, 71:16
**McDaniel)................. ...............35** [1] - 2:4
**McFadden** [1] - 71:20
**mean** [4] - 25:14, 31:14, 49:1, 72:6
**means** [1] - 43:22
**memory** [2] - 8:1, 11:23
**mentioned** [1] - 5:9
**Metropolitan** [3] - 4:9, 4:13, 5:5
**Mexico** [1] - 70:11
**microphone** [1] - 16:1
**middle** [3] - 29:21, 56:4, 69:1
**might** [2] - 37:12, 69:7
**mind** [1] - 63:23
**minute** [1] - 59:11
**minutes** [1] - 41:24
**mirror** [2] - 51:10, 51:20
**modification** [1] - 71:13
**moment** [2] - 12:11, 15:9
**Monday** [3] - 69:4, 69:22, 70:6
**money** [1] - 68:18
**month** [2] - 69:20, 70:15
**Moreira** [2] - 1:21, 72:22
**MOREIRA** [1] - 72:15
**most** [1] - 23:21
**motion** [2] - 3:14, 71:13

**motive** [2] - 42:17, 43:1
**move** [6] - 11:25, 27:10, 28:14, 31:8, 33:1, 33:22
**moved** [1] - 22:18
**movements** [2] - 5:13, 48:23
**moving** [2] - 5:15, 13:17
**MPD** [15] - 2:3, 4:1, 18:3, 18:4, 18:11, 20:15, 35:7, 47:8, 47:9, 56:21, 57:3, 57:7, 57:12, 60:24, 61:2
**MR** [127] - 3:7, 3:10, 3:17, 3:20, 3:24, 4:3, 6:10, 6:12, 6:13, 10:3, 10:6, 11:3, 11:25, 12:3, 12:5, 12:9, 12:13, 12:22, 12:24, 13:16, 14:4, 14:12, 14:18, 14:20, 15:8, 15:13, 15:16, 15:17, 16:23, 17:1, 17:20, 17:23, 19:3, 19:5, 20:3, 20:6, 20:20, 20:22, 21:7, 21:10, 21:13, 21:16, 21:21, 22:13, 22:15, 24:2, 24:4, 25:2, 25:5, 25:18, 25:21, 26:10, 26:12, 26:16, 26:20, 26:25, 27:10, 27:13, 28:3, 28:14, 28:16, 28:18, 28:23, 29:10, 29:14, 29:25, 30:3, 30:11, 30:13, 30:22, 31:8, 31:10, 31:13, 31:17, 31:20, 31:24, 32:3, 33:1, 33:3, 33:5, 33:22, 33:25, 34:23, 34:25, 35:2, 35:4, 36:22, 38:12, 38:14, 38:16, 39:3, 39:17, 40:12, 40:15, 41:21, 42:15, 42:17, 42:22, 43:4, 46:5, 46:19, 51:13, 52:24, 53:2, 53:4, 54:20, 57:9, 58:2, 63:11, 63:15, 64:13, 66:14, 66:17, 68:20, 69:10, 70:3, 70:5, 70:9, 70:14, 70:17, 71:4, 71:10, 71:16, 71:17, 71:23, 72:2, 72:8
**multiple** [9] - 5:12,

6:7, 7:2, 8:19, 20:1, 23:17, 23:22, 36:14, 68:2
**mylar** [24] - 19:22, 19:24, 20:1, 20:13, 21:1, 21:24, 22:1, 22:23, 23:3, 24:9, 24:14, 24:19, 24:22, 24:24, 24:25, 30:7, 34:4, 34:9, 34:12, 61:20, 62:2, 66:4, 66:8

### N

**name** [5] - 4:5, 4:6, 9:13, 14:24
**narcotic** [2] - 7:2, 7:3
**narcotics** [6] - 4:25, 5:2, 6:25, 7:6, 7:7, 7:10
**narratives** [1] - 46:11
**nature** [1] - 58:9
**near** [1] - 18:13
**neck** [1] - 41:25
**need** [4] - 37:12, 65:5, 68:14, 68:16
**needs** [1] - 42:20
**neighborhood** [2] - 8:13, 8:24
**nervous** [6] - 48:17, 48:20, 48:24, 48:25, 49:2, 58:8
**never** [12] - 55:22, 59:1, 59:21, 59:24, 60:2, 60:5, 60:8, 65:1, 65:15, 67:19, 68:4, 68:7
**New** [1] - 70:11
**next** [7] - 25:25, 44:18, 51:19, 52:2, 69:8, 70:16, 71:8
**night** [3] - 7:12, 52:8, 57:7
**nighttime** [1] - 52:6
**nine** [1] - 38:7
**nobody** [2] - 44:15, 53:20
**normal** [1] - 61:4
**normally** [2] - 45:1, 45:5
**Northeast** [9] - 5:24, 6:9, 6:19, 7:1, 7:22, 8:5, 13:1, 23:19, 29:2
**notes** [1] - 72:17
**nothing** [1] - 67:25
**noticed** [2] - 8:19, 19:15
**November** [2] - 37:14,

37:21
**nowhere** [4] - 64:24, 65:10, 67:6, 67:16
**number** [8] - 6:22, 7:5, 7:6, 35:12, 35:23, 48:19, 48:22, 57:12
**numerous** [2] - 6:6, 6:20
**NW** [3] - 1:14, 1:22, 72:24

### O

**object** [3] - 21:13, 22:12, 59:3
**objection** [27] - 6:10, 6:16, 10:3, 12:2, 12:3, 16:23, 27:12, 27:13, 28:16, 31:10, 33:3, 33:24, 33:25, 38:12, 38:14, 38:15, 39:3, 39:17, 40:12, 41:21, 42:15, 43:9, 46:5, 46:19, 57:9, 63:11, 64:13
**observation** [3] - 9:14, 15:2, 15:4
**observations** [1] - 65:24
**observe** [2] - 8:14, 19:14
**observed** [10] - 8:17, 9:4, 20:13, 28:25, 50:20, 54:9, 54:25, 55:2, 55:6, 55:8
**observing** [3] - 8:10, 47:25, 59:8
**occurred** [1] - 11:22
**October** [2] - 42:12, 43:14
**OF** [4] - 1:1, 1:3, 1:9, 72:13
**offense** [1] - 63:24
**offenses** [1] - 68:2
**OFFICE** [1] - 1:13
**OFFICER** [2] - 2:3, 4:1
**officer** [10] - 4:9, 6:14, 7:18, 18:7, 20:16, 43:5, 61:9, 61:12, 68:22, 69:11
**Officer** [15] - 3:25, 4:6, 7:25, 20:19, 24:5, 27:23, 28:8, 28:11, 30:14, 31:2, 31:5, 32:7, 33:6, 35:5, 50:1
**officers** [23] - 18:3, 18:5, 18:10, 18:11, 18:17, 18:23, 18:25, 23:23, 30:19, 44:17,

44:20, 44:21, 44:22, 44:25, 45:1, 45:2, 45:5, 45:19, 46:2, 46:17, 49:24, 59:7, 61:15
**official** [1] - 72:23
**Official** [1] - 1:21
**OFFICIAL** [1] - 72:13
**once** [1] - 71:8
**one** [43] - 3:17, 8:18, 12:11, 15:9, 18:16, 18:23, 18:25, 21:6, 23:20, 25:13, 25:25, 26:14, 29:22, 36:2, 36:11, 36:15, 37:6, 37:14, 37:21, 37:23, 38:19, 39:20, 40:23, 41:2, 41:9, 41:10, 41:16, 41:18, 42:5, 42:7, 42:9, 42:12, 43:14, 43:24, 44:1, 44:18, 47:1, 47:2, 50:23, 57:15, 68:21, 71:2
**one's** [1] - 42:11
**one-eight** [2] - 25:13, 25:25
**ones** [1] - 38:3
**OPC** [1] - 36:14
**open** [56] - 8:11, 9:8, 9:10, 9:12, 9:16, 9:18, 9:20, 9:25, 10:7, 10:11, 10:13, 14:7, 14:16, 15:5, 19:18, 21:12, 22:23, 26:19, 35:23, 36:9, 36:11, 36:14, 37:15, 37:22, 38:17, 38:20, 38:25, 39:5, 39:12, 39:16, 39:21, 40:7, 40:8, 40:11, 40:14, 40:15, 40:17, 40:18, 40:21, 50:7, 55:10, 55:13, 55:17, 55:20, 55:25, 60:8, 63:25, 64:17, 67:2, 67:8, 67:18, 68:1, 68:8, 69:5, 71:7
**opened** [5] - 30:6, 36:2, 38:7, 54:14, 65:23
**operational** [2] - 12:15, 46:16
**operations** [1] - 4:24
**opportunity** [5] - 10:23, 11:18, 27:22, 46:10, 69:4
**ounces** [6] - 23:1, 23:4, 62:3, 62:16, 66:1, 66:9

**outcome** [1] - 39:9
**outnumber** [1] - 23:24
**overrule** [2] - 6:16, 43:9
**overruled** [9] - 38:18, 39:4, 39:18, 41:22, 42:2, 42:3, 46:7, 46:20, 57:10
**overtime** [1] - 68:19
**overturned** [1] - 42:9

## P

**p.m** [2] - 1:5, 72:11
**Page** [4] - 63:19, 64:5, 65:20
**PAGE** [1] - 2:2
**pages** [1] - 68:14
**pants** [1] - 30:20
**part** [22] - 5:4, 5:8, 6:1, 8:7, 13:24, 20:25, 21:1, 21:11, 27:21, 45:23, 46:8, 48:7, 48:20, 48:24, 49:3, 49:4, 49:5, 65:19, 65:20, 67:9, 67:10
**partially** [1] - 19:18
**participated** [6] - 6:6, 6:20, 7:9, 46:17, 47:23, 65:9
**particular** [3] - 6:15, 23:23, 36:16
**particularly** [2] - 39:12, 44:7
**partner** [4] - 22:18, 22:20, 32:7, 66:20
**passenger** [1] - 50:1
**past** [2] - 18:21, 55:4
**patdown** [2] - 25:8, 25:10
**pathway** [1] - 8:20
**patrol** [5] - 5:23, 6:2, 18:19, 45:23, 46:8
**patrolled** [1] - 44:9
**patrolling** [2] - 8:10, 8:12
**pause** [2] - 22:15, 66:17
**Pause** [5] - 12:17, 15:11, 34:24, 52:23, 53:1
**paused** [4] - 12:22, 14:12, 26:20, 30:3
**pausing** [18] - 12:9, 14:20, 15:16, 17:23, 19:5, 20:6, 20:22, 21:10, 21:21, 24:4, 25:5, 25:21, 26:12, 28:5, 28:23, 29:14, 30:13, 31:24

**pay** [1] - 68:18
**paying** [1] - 8:8
**pending** [7] - 37:22, 38:20, 39:8, 39:12, 39:15, 39:20, 40:5
**people** [3] - 9:2, 23:24, 61:4
**period** [1] - 59:8
**permissible** [1] - 61:25
**permission** [1] - 51:13
**person** [12] - 7:20, 9:20, 9:24, 10:7, 10:10, 10:13, 31:3, 32:8, 32:9, 32:21, 32:24, 59:1
**phone** [3] - 58:5, 60:24, 61:2
**photo** [7] - 14:1, 27:5, 31:2, 57:23, 58:20, 60:19, 60:21
**photograph** [4] - 27:6, 31:5, 32:13, 32:23
**photographed** [1] - 32:10
**photographs** [1] - 33:14
**photos** [6] - 32:7, 33:16, 60:23, 60:24, 60:25, 61:2
**physically** [2] - 10:10, 31:15
**picture** [3] - 26:13, 26:22, 52:18
**pictures** [7] - 34:11, 57:20, 61:4, 61:10, 61:12, 61:14, 61:16
**pink** [3] - 17:12, 17:17, 17:19
**Pittsburgh** [5] - 70:19, 70:24, 71:3, 71:5, 71:9
**place** [4] - 16:6, 22:20, 27:18, 49:12
**placed** [7] - 15:24, 16:3, 23:12, 26:15, 29:4, 30:14, 36:18
**placing** [1] - 23:8
**Plaintiff** [1] - 1:4
**plastic** [3] - 24:19, 24:22, 66:8
**play** [5] - 11:9, 21:17, 28:4, 31:25, 47:22
**played** [3] - 11:12, 25:7, 53:23
**playing** [62] - 11:11, 12:6, 12:8, 14:4, 14:9, 14:10, 14:18, 14:19, 15:8, 15:14, 15:15, 17:20, 17:22,

19:3, 19:4, 20:3, 20:5, 20:20, 20:21, 21:7, 21:9, 21:20, 22:13, 22:14, 24:2, 24:3, 25:2, 25:4, 25:18, 25:20, 26:10, 26:11, 26:16, 26:17, 28:22, 29:10, 29:11, 29:13, 29:25, 30:2, 30:12, 31:22, 31:23, 32:2, 50:14, 53:17, 53:18, 54:1, 54:2, 54:5, 54:18, 56:8, 56:11, 56:19, 58:1, 59:5, 60:15, 61:3, 61:7, 61:18, 66:14
**PLLC** [1] - 1:17
**plug** [1] - 52:25
**plugged** [1] - 52:24
**PMS** [1] - 36:24
**point** [24] - 13:1, 14:6, 15:18, 16:17, 18:21, 18:22, 19:15, 20:15, 20:18, 20:23, 23:5, 23:16, 24:6, 24:18, 30:16, 38:8, 49:16, 50:5, 51:1, 53:13, 54:1, 55:11, 64:16, 67:2
**pointed** [1] - 51:16
**pointing** [4] - 14:21, 14:23, 15:1, 42:6
**police** [15] - 4:9, 7:13, 7:15, 7:17, 7:20, 10:1, 10:14, 23:23, 35:7, 35:25, 39:1, 39:6, 39:15, 47:2, 56:5
**Police** [4] - 4:9, 4:14, 5:5, 56:21
**policing** [1] - 44:6
**portion** [7] - 18:13, 21:5, 21:17, 28:11, 29:21, 30:4
**positive** [1] - 34:22
**possessing** [4] - 9:17, 9:20, 9:25, 14:7
**possession** [6] - 7:6, 9:16, 15:5, 55:20, 64:17, 67:2
**potential** [1] - 31:16
**PPMS** [1] - 36:3
**predetermined** [2] - 25:15, 25:22
**preparation** [1] - 27:21
**presence** [2] - 25:17, 45:10
**present** [1] - 3:12
**preserve** [1] - 26:4
**preserved** [3] - 31:12,

31:14, 31:16
**presided** [1] - 70:25
**pretty** [1] - 23:25
**previously** [4] - 6:8, 6:17, 6:24, 24:13
**probable** [12] - 9:5, 9:7, 22:22, 30:15, 49:9, 55:12, 62:25, 64:12, 64:16, 67:1, 67:7, 67:18
**procedure** [1] - 46:16
**proceed** [3] - 12:21, 15:12, 33:9
**proceedings** [1] - 72:18
**processed** [1] - 32:10
**proclaimed** [2] - 51:1, 53:21
**prohibit** [1] - 69:2
**proper** [1] - 42:3
**protective** [2] - 25:8, 25:10
**provide** [1] - 46:11
**provided** [1] - 47:24
**providing** [1] - 64:1
**public** [3] - 8:12, 8:21, 63:25
**pull** [1] - 16:1
**pulled** [6] - 21:24, 22:24, 24:9, 30:6, 61:20, 66:8
**purportedly** [1] - 59:22
**purposes** [1] - 11:4
**pursuit** [2] - 41:10, 41:15
**push** [1] - 47:22

## Q

**QUESTION** [2] - 66:16, 66:23
**questions** [13] - 34:25, 44:18, 45:24, 46:10, 46:11, 47:20, 62:24, 63:1, 63:2, 63:8, 67:20, 68:5, 68:10

## R

**radio** [2] - 10:17, 46:15
**RDR** [3] - 1:21, 72:15, 72:22
**reaching** [1] - 41:24
**read** [12] - 37:6, 64:22, 64:23, 65:4, 65:5, 65:6, 65:7, 65:9, 68:14, 68:16, 68:17, 68:23
**really** [2] - 57:24
**reason** [3] - 39:23,

40:1, 40:10
**reasonable** [2] - 55:15, 56:3
**receive** [1] - 44:12
**received** [2] - 5:5, 48:25
**Recess** [1] - 12:20
**recognize** [11] - 11:1, 11:8, 11:14, 26:23, 27:2, 27:25, 28:6, 30:24, 32:13, 32:17, 33:11
**recollection** [1] - 65:8
**record** [7] - 3:5, 11:12, 12:9, 12:22, 14:12, 26:20, 29:20
**recover** [1] - 6:14
**recovered** [8] - 6:8, 27:7, 30:19, 32:11, 32:20, 32:23, 33:19, 58:16
**recoveries** [5] - 6:18, 6:21, 6:24, 7:4, 7:10
**recovering** [5] - 16:12, 20:1, 21:4, 62:1, 62:15
**recovery** [2] - 6:18, 38:23
**red** [1] - 50:7
**referencing** [1] - 15:4
**referring** [1] - 56:15
**regard** [6] - 38:14, 38:16, 38:22, 42:19, 42:24, 71:18
**regarding** [3] - 47:24, 64:9, 68:22
**REGGIE** [1] - 1:10
**related** [1] - 44:2
**relation** [1] - 27:15
**release** [1] - 71:13
**relevance** [6] - 6:12, 8:22, 38:16, 40:12, 46:19, 57:9
**relevant** [4] - 6:13, 43:4, 43:8, 49:1
**reliability** [1] - 43:5
**rely** [1] - 43:7
**remember** [7] - 35:17, 48:2, 53:22, 54:3, 58:18, 59:9, 59:13
**removed** [1] - 66:4
**renders** [1] - 42:19
**rep** [1] - 40:6
**repeat** [2] - 25:24, 61:11
**rephrase** [7] - 9:15, 10:5, 10:6, 17:1, 18:9, 21:15, 67:13
**replay** [1] - 56:7
**report** [5] - 36:3,

36:24, 39:23, 41:5, 44:12
**reported** [1] - 47:16
**REPORTER** [1] - 72:13
**Reporter** [4] - 1:21, 1:21, 66:18, 72:23
**reschedule** [1] - 70:19
**resealable** [4] - 19:21, 19:24, 20:1, 66:8
**resolution** [1] - 71:11
**respect** [1] - 37:25
**responded** [1] - 6:5
**response** [3] - 43:3, 63:20, 64:9
**rest** [1] - 43:10
**restart** [1] - 21:19
**resulted** [1] - 38:23
**resulting** [1] - 35:14
**results** [1] - 34:20
**resume** [2] - 68:18, 71:20
**retrieved** [1] - 32:9
**review** [7] - 37:5, 37:13, 47:6, 58:7, 59:21, 65:6, 67:15
**reviewed** [1] - 43:24
**reviews** [2] - 37:8, 65:13
**rock** [1] - 34:16
**rock-like** [1] - 34:16
**Room** [2] - 1:22, 72:24

## S

**S-I-B-R-I-A-N** [1] - 4:6
**safety** [2] - 22:10
**Saratoga** [25] - 5:24, 6:9, 6:19, 6:21, 6:25, 7:4, 7:10, 7:21, 8:4, 8:18, 13:1, 23:18, 29:1, 35:14, 44:7, 44:9, 44:16, 45:14, 45:19, 46:3, 49:20, 50:15, 50:17, 61:1
**satchel** [34] - 19:12, 19:14, 19:15, 19:18, 19:22, 20:14, 20:23, 21:2, 21:12, 21:25, 22:2, 22:4, 22:7, 22:11, 22:12, 22:24, 24:10, 24:11, 24:14, 24:15, 24:18, 25:1, 30:6, 30:9, 33:17, 33:20, 34:5, 34:13, 34:17, 59:16, 59:19, 65:23, 66:6, 66:9
**satchels** [1] - 22:9
**saved** [1] - 31:18
**saw** [44] - 9:16, 9:24,

10:10, 10:13, 11:1, 14:16, 15:19, 15:23, 16:5, 16:19, 16:21, 21:11, 21:18, 21:22, 23:3, 24:13, 24:19, 24:23, 26:22, 26:23, 27:7, 27:16, 27:18, 27:25, 29:4, 29:15, 30:4, 32:5, 32:14, 34:4, 37:3, 51:3, 53:11, 54:6, 54:12, 54:15, 54:16, 55:9, 55:20, 56:4, 58:15, 59:1, 63:22, 65:24
**scene** [5] - 26:1, 26:2, 26:4, 57:13, 60:3
**scheduled** [3] - 69:11, 70:5, 71:19
**screen** [10] - 11:5, 11:8, 13:3, 13:8, 13:10, 13:12, 13:20, 13:25, 29:21, 53:24
**SE** [1] - 1:18
**seals** [2] - 21:5, 21:6
**search** [5] - 4:25, 24:11, 37:10, 37:16, 38:23
**searched** [3] - 36:17, 37:18, 38:10
**seat** [1] - 58:21
**seated** [10] - 3:12, 8:19, 9:2, 9:22, 13:5, 16:7, 26:5, 27:16, 29:3
**second** [1] - 50:23
**seconds** [12] - 11:9, 28:5, 50:11, 50:22, 50:23, 50:24, 54:17, 54:21, 54:22, 54:25, 55:6, 55:8
**Secret** [6] - 57:2, 57:3, 57:5, 57:6, 57:8, 57:13
**see** [78] - 8:16, 9:6, 9:11, 9:17, 9:20, 10:7, 11:8, 12:12, 12:15, 13:3, 13:9, 13:20, 13:24, 14:1, 14:6, 15:10, 15:22, 16:20, 17:3, 17:6, 17:11, 18:7, 18:13, 19:10, 19:11, 19:12, 19:13, 19:17, 19:20, 19:21, 19:24, 20:25, 21:1, 24:14, 24:17, 25:6, 26:18, 28:24, 28:25, 29:4, 30:8, 34:15, 37:22, 39:22, 40:24, 42:7, 42:8, 43:23, 47:2, 47:7,

48:4, 48:6, 50:6, 50:15, 51:6, 51:9, 51:11, 51:15, 51:18, 52:1, 52:4, 52:5, 52:8, 52:9, 52:14, 52:17, 52:22, 53:2, 57:16, 58:4, 58:7, 58:22, 61:15, 63:16, 63:17, 66:11
**seeing** [1] - 37:6
**seized** [1] - 27:5
**seizing** [1] - 21:4
**sense** [1] - 16:16
**sentencing** [4] - 70:19, 70:24, 71:19, 71:23
**September** [2] - 40:24, 63:3
**service** [1] - 6:6
**Service** [6] - 57:2, 57:3, 57:5, 57:6, 57:8, 57:13
**set** [2] - 70:22, 71:1
**several** [1] - 38:4
**shadow** [2] - 52:5, 52:15
**shadows** [1] - 52:8
**shaped** [1] - 59:2
**shining** [5] - 19:6, 19:8, 52:12, 57:16, 58:25
**shirt** [5] - 51:10, 51:17, 51:19, 52:2
**short** [1] - 12:18
**show** [8] - 28:3, 30:22, 33:6, 33:8, 34:11, 47:19, 52:20, 52:21
**showed** [2] - 30:7, 61:23
**showing** [1] - 32:16
**shown** [1] - 24:9
**shows** [1] - 53:6
**SIBRIAN** [2] - 2:3, 4:1
**Sibrian** [3] - 3:25, 4:6, 35:5
**side** [11] - 8:17, 9:22, 13:25, 14:2, 15:24, 16:3, 16:6, 26:15, 29:5, 56:15, 56:21
**sidewalk** [7] - 8:20, 8:21, 8:25, 9:1, 9:3, 9:23
**significance** [2] - 8:22, 24:22
**significant** [1] - 19:23
**silver** [1] - 29:22
**SIMPSON** [1] - 1:6
**Simpson** [80] - 3:3, 3:11, 3:12, 14:25, 15:1, 15:18, 15:22,

16:5, 16:10, 16:19, 17:4, 18:16, 19:6, 19:9, 20:9, 21:11, 21:22, 21:24, 22:4, 22:19, 22:20, 22:22, 23:7, 24:9, 24:13, 25:8, 25:23, 26:5, 26:14, 27:16, 27:18, 29:3, 29:15, 30:6, 30:14, 34:5, 35:15, 35:18, 44:11, 49:14, 49:17, 50:6, 50:21, 51:23, 52:1, 53:6, 53:11, 55:2, 55:13, 57:17, 57:19, 57:20, 58:4, 58:8, 58:21, 59:1, 59:2, 59:8, 59:12, 59:15, 60:4, 60:5, 60:8, 60:21, 61:8, 61:19, 61:20, 63:1, 64:6, 64:9, 64:11, 64:15, 64:16, 64:25, 65:11, 66:19, 66:20, 66:25, 67:2, 68:2
**Simpson's** [16] - 19:11, 20:23, 21:2, 24:11, 29:23, 30:9, 30:18, 30:20, 31:3, 32:8, 32:20, 33:17, 33:20, 34:13, 34:17, 51:3
**sit** [1] - 35:22
**siting** [1] - 51:23
**sitting** [5] - 15:25, 16:4, 55:3, 58:21, 70:7
**size** [6] - 62:1, 62:3, 62:13, 66:1, 66:3, 66:7
**skip** [1] - 38:3
**slow** [1] - 66:18
**small** [2] - 17:8, 17:13
**smoking** [1] - 8:12
**snow** [2] - 69:5, 69:6
**snuck** [1] - 60:16
**someone** [5] - 9:17, 14:21, 42:6, 48:4, 48:9
**sooner** [1] - 71:12
**sorry** [9] - 23:10, 28:19, 31:13, 42:22, 49:14, 61:11, 66:7, 66:18, 66:23
**sounded** [1] - 14:14
**space** [1] - 63:25
**spaces** [1] - 8:12
**speaking** [1] - 65:17
**special** [1] - 4:24
**specialized** [2] - 4:20,

4:22
**specific** [5] - 14:2, 16:12, 16:25, 38:13, 63:2
**specifically** [2] - 5:20, 10:5
**spelling** [1] - 4:5
**spot** [1] - 44:22
**spotlight** [4] - 13:21, 13:22, 14:2, 14:3
**stamped** [1] - 31:18
**standing** [8] - 17:24, 18:2, 18:8, 19:1, 29:8, 42:11, 51:10, 51:19
**start** [5] - 57:16, 59:12, 60:7, 71:6
**starting** [4] - 24:11, 50:10, 69:12, 70:6
**starts** [1] - 65:20
**state** [1] - 3:4
**STATES** [3] - 1:1, 1:3, 1:10
**States** [4] - 1:13, 3:3, 3:8, 72:23
**stating** [1] - 4:5
**stay** [1] - 37:12
**stenographic** [1] - 72:17
**sticking** [1] - 21:2
**still** [14] - 9:25, 15:19, 17:2, 17:3, 17:24, 29:15, 29:19, 38:20, 38:25, 39:12, 39:20, 40:7, 42:11, 50:5
**stop** [3] - 18:6, 37:25, 53:15
**stopped** [1] - 54:20
**stopping** [2] - 51:6, 58:2
**Street** [2] - 1:14, 1:18
**street** [1] - 56:5
**strip** [1] - 21:6
**subject** [2] - 35:23, 36:6
**submit** [2] - 6:13, 42:25
**substance** [4] - 34:9, 34:16, 34:18, 68:22
**suggested** [1] - 58:8
**supposed** [1] - 70:13
**suppress** [1] - 3:14
**suppression** [9] - 4:15, 4:19, 4:20, 5:4, 5:9, 18:18, 18:24, 18:25, 25:16
**suspected** [4] - 24:25, 62:9, 62:15, 62:17
**suspicion** [9] - 16:11, 16:13, 16:14, 49:6,

49:7, 55:12, 55:15, 55:23, 56:3
**sustained** [18] - 10:4, 40:23, 41:1, 41:2, 41:8, 41:19, 42:1, 42:4, 42:5, 42:7, 42:13, 42:25, 43:15, 43:19, 43:20, 43:21, 44:2
**Sutter** [1] - 58:17
**Sworn** [1] - 4:1
**synopsis** [1] - 37:7

**T**

**table** [1] - 3:12
**tactical** [1] - 41:5
**taught** [1] - 5:11
**team** [4] - 4:19, 4:20, 5:4, 25:16
**ten** [2] - 6:23, 54:17
**tentatively** [1] - 70:22
**term** [2] - 5:2, 6:7
**terms** [3] - 7:5, 16:21, 53:25
**test** [1] - 34:20
**tested** [2] - 34:18, 34:22
**testified** [3] - 17:2, 54:13, 62:21
**testifying** [4] - 10:22, 11:19, 27:21, 62:22
**testimony** [12] - 43:7, 50:4, 51:4, 54:6, 55:9, 61:23, 64:21, 64:24, 67:6, 67:16, 67:17, 68:23
**THE** [81] - 1:1, 1:1, 1:10, 3:2, 3:9, 3:13, 3:18, 3:21, 4:17, 4:18, 6:11, 6:16, 9:9, 9:10, 10:4, 12:2, 12:4, 12:11, 12:15, 12:18, 12:21, 13:18, 15:9, 15:12, 16:25, 17:9, 17:10, 17:17, 17:19, 21:15, 27:12, 27:14, 28:17, 31:11, 31:14, 31:19, 33:4, 33:24, 34:1, 35:1, 36:23, 38:13, 38:15, 38:18, 39:4, 39:18, 40:14, 41:22, 42:16, 42:20, 43:3, 43:9, 46:7, 46:20, 51:14, 57:10, 63:13, 63:17, 64:14, 68:17, 68:25, 69:13, 69:14, 69:15, 69:16, 69:18, 69:25, 70:1, 70:4, 70:8,

70:10, 70:16, 70:18, 70:21, 70:22, 71:5, 71:15, 71:21, 72:1, 72:4, 72:9
**themselves** [1] - 48:5
**thinking** [1] - 26:3
**three** [1] - 50:23
**throughout** [1] - 44:9
**thumb** [1] - 17:14
**Thursday** [1] - 1:4
**timestamp** [21] - 11:13, 12:6, 12:7, 12:10, 19:5, 20:4, 20:6, 20:22, 21:7, 21:10, 25:2, 25:19, 25:21, 28:18, 29:14, 29:25, 30:3, 30:13, 31:21, 31:24, 31:25
**timing** [3] - 54:11, 54:24, 71:18
**today** [9] - 10:22, 11:19, 27:21, 35:23, 37:4, 37:5, 43:24, 54:13, 55:5
**together** [3] - 18:19, 18:20
**tomorrow** [2] - 69:4, 69:12
**tonight** [1] - 69:16
**took** [9] - 26:22, 27:5, 31:2, 31:5, 32:7, 49:12, 57:23, 60:19, 60:21
**top** [2] - 21:5, 50:8
**touched** [2] - 41:25, 65:13
**towards** [2] - 32:6, 55:3
**town** [1] - 70:11
**train** [1] - 18:19
**trained** [1] - 4:24
**training** [18] - 5:6, 5:8, 16:11, 19:25, 21:3, 22:8, 22:25, 24:21, 24:24, 41:5, 47:23, 47:24, 48:1, 48:24, 49:3, 49:4, 62:1, 62:14
**transaction** [1] - 7:3
**transcript** [4] - 67:15, 68:23, 72:17, 72:18
**TRANSCRIPT** [1] - 1:9
**trial** [2] - 70:6, 70:13
**trick** [1] - 49:16
**true** [5] - 35:22, 45:8, 48:16, 72:16, 72:18
**try** [2] - 26:6, 48:5
**trying** [5] - 12:13, 26:2, 49:16, 70:18
**Tuesday** [1] - 69:9

**turn** [3] - 12:13, 29:1, 48:5
**turned** [2] - 41:11
**two** [19] - 23:1, 23:4, 34:11, 46:21, 49:24, 50:2, 50:3, 50:23, 50:24, 54:22, 54:25, 55:6, 55:8, 59:11, 62:3, 62:16, 66:1, 66:9, 71:2
**type** [2] - 48:13, 61:24

**U**

**U.S** [2] - 1:13, 1:22
**unauthorized** [1] - 41:14
**under** [6] - 23:14, 23:15, 27:17, 58:21, 66:20, 71:15
**unfortunately** [1] - 69:18
**uniform** [2] - 7:15, 7:17
**union** [1] - 40:6
**unit** [6] - 4:20, 4:22, 5:9, 18:18, 18:24, 19:1
**UNITED** [3] - 1:1, 1:3, 1:10
**United** [4] - 1:13, 3:3, 3:8, 72:23
**unlawful** [1] - 38:22
**unlawfully** [1] - 36:17
**unless** [2] - 68:12, 68:14
**unnecessary** [2] - 36:13, 37:9
**up** [11] - 11:3, 21:16, 26:25, 30:6, 52:19, 52:21, 57:20, 59:7, 60:16, 64:7, 70:24
**uses** [1] - 23:22

**V**

**vehicle** [47] - 7:13, 7:20, 10:1, 10:14, 13:24, 15:3, 16:9, 17:2, 17:3, 17:6, 17:11, 36:17, 36:18, 37:10, 37:16, 41:10, 41:14, 44:4, 47:3, 47:7, 47:8, 47:9, 47:10, 47:11, 47:13, 49:21, 49:22, 49:25, 50:12, 51:2, 51:20, 53:10, 53:11, 53:15, 54:8, 54:10, 55:24, 56:2, 56:4, 56:5, 56:6, 56:20, 56:22,

56:23
**vehicles** [3] - 46:22, 57:12, 57:13
**video** [19] - 20:15, 21:11, 21:17, 21:23, 22:16, 28:24, 29:6, 32:6, 50:10, 50:25, 51:6, 52:20, 53:17, 53:18, 53:19, 53:23, 54:1, 54:2, 54:5
**Video** [34] - 11:11, 12:8, 14:10, 14:19, 15:15, 17:22, 19:4, 20:5, 20:21, 21:9, 21:20, 22:14, 24:3, 25:4, 25:20, 26:11, 26:17, 28:22, 29:13, 30:2, 30:12, 31:23, 32:2, 50:14, 54:18, 56:8, 56:11, 56:19, 58:1, 59:5, 60:15, 61:3, 61:7, 61:18
**view** [5] - 18:21, 18:22, 29:9, 52:3, 52:17
**violent** [2] - 6:5, 23:21
**visible** [4] - 19:17, 24:5, 29:6, 29:16
**voice** [1] - 20:7

**W**

**waist** [2] - 19:10, 19:11
**waistband** [1] - 30:19
**waiting** [4] - 18:3, 18:4, 18:23, 59:6
**walk** [1] - 8:25
**walked** [1] - 18:21
**walking** [2] - 5:16, 48:12
**WALTON** [1] - 1:10
**warrants** [2] - 4:25
**Washington** [4] - 1:14, 1:18, 1:23, 72:25
**watch** [4] - 10:23, 11:18, 27:22, 62:11
**watched** [3] - 18:14, 21:23, 22:17
**water** [1] - 58:11
**weapon** [1] - 32:13
**wearing** [5] - 10:19, 19:12, 19:14, 20:14, 51:17
**weed** [3] - 20:9, 59:19, 62:4
**wheel** [1] - 50:11
**white** [8] - 19:21, 19:24, 20:25, 23:3, 24:13, 34:16, 66:4, 66:7

**white-in-color** [1] - 19:21
**whole** [4] - 53:19, 65:4, 68:14, 69:20
**wine** [4] - 55:21, 55:22, 58:17, 63:22
**withdraw** [1] - 24:1
**WITNESS** [8] - 2:2, 4:18, 9:10, 17:10, 17:19, 69:14, 69:16, 69:25
**Witness** [2] - 37:8, 65:13
**witness** [4] - 3:23, 43:5, 43:6, 69:3
**witnesses** [2] - 3:16, 3:19
**word** [4] - 25:15, 25:23, 48:1, 55:22
**words** [1] - 45:21
**works** [2] - 69:10, 72:2
**worn** [22] - 10:19, 10:23, 11:16, 17:21, 18:14, 24:5, 25:6, 26:18, 27:22, 27:25, 28:8, 28:11, 30:5, 41:8, 41:11, 43:17, 47:6, 47:21, 50:10, 53:6, 58:7, 59:21

## Y

**year** [1] - 42:2
**years** [5] - 4:12, 7:9, 35:8, 44:6, 44:10
**yourself** [1] - 4:4

## Z

**zipper** [3] - 19:16, 19:18, 34:5