BEFORE THE UNITED STATES DISTRICT COURT
                       FOR THE DISTRICT OF COLUMBIA


UNITED STATES OF AMERICA,          .
                                   .  Case Number 25-cr-261
            Plaintiff,             .
                                   .
      vs.                          .
                                   .  Washington, D.C.
ANTWAIN DARRELL SIMPSON,           .  March 13, 2026
                                   .  2:04 p.m.
            Defendant.             .
- - - - - - - - - - - - - - - - -


              TRANSCRIPT OF EVIDENTIARY HEARING, VOLUME II
                 BEFORE THE HONORABLE REGGIE B. WALTON
                     UNITED STATES DISTRICT JUDGE



APPEARANCES:

For the United States:        BENJAMIN HELFAND, AUSA
                              United States Attorney's Office
                              601 D Street Northwest
                              Washington, D.C. 20579


For the Defendant:            BRIAN MCDANIEL, ESQ.
                              The McDaniel Law Group, PLLC
                              1001 L Street Southeast
                              Washington, D.C. 20003




Official Court Reporter:      SARA A. WICK, RPR, CRR
                              333 Constitution Avenue Northwest
                              Room 4704-B
                              Washington, D.C. 20001
                              202-354-3284


Proceedings recorded by stenotype shorthand.
Transcript produced by computer-aided transcription.

C O N T E N T S

TESTIMONY

MANUEL SIBRIAN        Cross-Examination.................  3
                      Redirect Examination..............  18

P R O C E E D I N G S

(Call to order of the court.)

COURTROOM DEPUTY:  This is Criminal Matter 25-261, United States of America versus Antwain Simpson.

May I have counsel approach the lectern and state your appearance for the record, beginning with the government.

MR. HELFAND:  Good afternoon, Your Honor.  Benjamin Helfand for the United States.

THE COURT:  Good afternoon.

MR. MCDANIEL:  Good afternoon, Your Honor.  May it please the Court.  Brian McDaniel on behalf of Mr. Simpson. Mr. Simpson is present and seated to my right.

THE COURT:  Good afternoon.

I think the officer was on the stand --

MR. HELFAND:  Yes.

THE COURT:  -- and was being cross-examined.  So he can come in.

MANUEL SIBRIAN, WITNESS FOR THE GOVERNMENT, RESUMED STAND

CROSS-EXAMINATION (Continued)

BY MR. MCDANIEL:

Q.   Good afternoon, Officer.  You might want to state and spell your name for the record, since we're starting back up.

A.   Good afternoon.  My name is Officer Sibrian, S-i-b-r-i-a-n.

Q.   And, Officer Sibrian, we last were here, and I was asking you some questions about your grand jury testimony.

Do you remember that that's where we left off?

A.    Yes.

Q.    And the question that I had asked you was whether or not --
let me ask you this:  Have you since had an opportunity to
review again your testimony from the grand jury?

A.    No.

Q.    And so what I left off asking you was whether or not,
outside of the reference to probable cause being provided based
upon your alleged observation of an open container of alcohol,
that you mentioned any other basis for probable cause in
connection with your search of Mr. Simpson the day in question.

And if it's helpful, I can approach again with page 17 of
your grand jury testimony.

Just for the record, if you could read from page 17, line 6
through line 17; if you could read it out loud for the record.

Have you had a chance to see it now, sir?

A.    I've seen it now, yes.

Q.    Can you read it out loud for the record, using the
microphone, starting at line 6.

MR. HELFAND:  Objection, Your Honor.  He's asking the
witness to read a question that I posed to him in grand jury.  I
don't think this is a proper form of impeachment.

THE COURT:  Is there a question?

MR. HELFAND:  Yes.  Line 6 is a question that I asked
the witness in grand jury.

THE COURT:  And then what?  That's a prelude for the answer?

MR. MCDANIEL:  Yes, Your Honor.

THE COURT:  Overruled.

THE WITNESS:  I would feel more comfortable if you would read it.  It would be the same thing that we both are reading.

BY MR. MCDANIEL:

Q.   You would prefer me for to read it?

A.   Yes.  I don't think that would be much of a difference, whether I read it or you read it.

Q.   That's fine, sir.  At line 6 -- after I get done reading it, what I'm going to do is I'm going to ask you if you agree that's what you said.  Okay?

Line 6, page 17:  "And I'm going to pause at 22:04:18 when you were telling Mr. Simpson -- we heard, I think it was, your partner telling Mr. Simpson 'you're not under arrest, you're just being detained,' is that right?"

And your answer:  "Yes, I said that."

Line 11, question:  "Was that you?  I'm sorry."

Line 12:  "That was me."

And line 13:  "Okay.  I apologize.  When you told Mr. Simpson that, did you think that you had probable cause to arrest Mr. Simpson at that point for possession of an open container of alcohol?"

Your answer was:  "Yes."

Did I read that correctly?

A.    Yes.

Q.    Now, based upon your recollection of your review of the transcript, my last question to you was whether or not you agree that in the entirety of your testimony before the grand jury, the only basis upon which you allege that you had probable cause before the grand jury was this open container of alcohol?

A.    I think the question that was being asked then was very specific, and I answered the question that was asked.

Q.    Right.  So I'm going to ask my question again.  I understand it was a specific question and a specific answer.

I'm asking you whether or not, within the entirety of your testimony before the grand jury, you agreed that the only basis upon which you allege to have had probable cause was the open container of alcohol?

A.    I believe I answered the question that was asked to me at that time.

Q.    So let me ask it a different way, and maybe you will like it differently.

Do you recall at any point in time before the grand jury stating that you had any other probable cause for the search of Mr. Simpson?

A.    I believe during grand jury, I just answered the questions that were asked to me.

Q.   Sir, I understand that.  So I think my question is simple.

As you sit here today, having reviewed your grand jury, do you recall providing the grand jury with any other reason that would have established probable cause other than the open container of alcohol?

It's a yes or a no.

A.   I believe I'm being clear with my answer.  I provided every answer to every question that was asked to me during grand jury.

MR. MCDANIEL:  Your Honor, if I could ask the Court to direct him to answer the question.

I understand his response --

THE COURT:  I believe the question is:  When you were before the grand jury, did you say you had probable cause to arrest the defendant for any other reason other than the open container?

THE WITNESS:  We talked about everything that happened on the scene.  I observed mylar bags, as we stated before on record.  I observed marijuana inside the satchel before the arrest was made.

BY MR. MCDANIEL:

Q.   Right.  But -- so I understand that, sir.

A.   If we're talking about that, then yes, there is more.  But if you're asking me if this is the very first question that was asked and if this is the probable cause that led me to everything else, that is the -- based on what I'm reading, that

is the first time that they're asking me, Did you have probable cause to arrest him at this time?  I don't think anything else from my observations were asked by this question.  Right?

So that's why I wanted to be clear.

Q.    Right.  I understand.

A.    I had more observation.  If you want me to, I can list all the observations that I made that day, but I don't think you want me to take that route.

Q.    You've already done that.

A.    Okay.

Q.    I'm just saying to you -- or asking you whether or not you recall when you were in the grand jury, the only basis for probable cause that you stated in the grand jury was this open container of alcohol?

A.    I understand the question, and I think it's a very specific question.  I wouldn't want to say yes.  I would like to read the whole transcript, if you want me to answer that specific question, because I know what I observed.  I know what my observations were that day.

And if you're asking me a specific question of what I said or what was asked to me that day in grand jury, I will have to read the whole transcript, not just the three pieces that you just showed me, if you're asking for a very specific question. I wouldn't want to put myself in that situation.

Q.    Right.  So I would have expected that -- one, you said

before that you had read your grand jury.

A.   I didn't say that today.  You said that.

Q.   No, no.  This is not the first time you've testified in this matter.  We're resuming your testimony.

A.   From months ago, yes.

Q.   Right.  And do you recall in that testimony that you represented that you had read your transcript from the grand jury?

A.   At that point, I had read the transcript; months ago, yes; when we first came here, yes.

Q.   All right.

     (Video played.)

          BY MR. MCDANIEL:

Q.   Officer, is this your body-worn camera -- or the video from your body-worn camera from that day?  Do you recall?

A.   Yes.

Q.   And in the frame, do we have Mr. Simpson sitting in the chair?

A.   Yes.

Q.   And you agree that at no point in time did your body-worn camera capture Mr. Simpson in possession of any bottle that you believed to have been an alcoholic bottle?

A.   That is correct.

     (Video played.)

          BY MR. MCDANIEL:

Q.    So it's true, is it not, Officer, that as we look to what would be the right of Mr. Simpson, you don't see any bottle that you believe to be an alcoholic bottle; correct?

A.    Are we referring to this specific frame that we're seeing right now?

Q.    This frame that we're seeing right now, yes.

Do you see my arrow?

A.    Uh-huh.

Q.    Do you agree that that's a water bottle?

A.    It looks like one.

Q.    And you were on the scene and shining your light on Mr. Simpson and others for about a minute and a half before you start having any conversation with Mr. Simpson?

A.    Yes.

Q.    So in other words, you don't get out of your vehicle and approach Mr. Simpson and say to him "stand up, I saw you drinking a bottle of alcohol"; correct?

A.    Based on my training and experience, I don't think that would be a tactical way to approach.

Q.    So you'll have an opportunity to explain why you did what you did.  I'm just asking you whether or not you agree that when you got out of your vehicle, you didn't approach Mr. Simpson and ask him to stand up because you had seen him drinking what you thought to be a bottle of alcohol.

A.    Correct.

(Video played.)

       BY MR. MCDANIEL:

Q.  So you just took a picture of that gentleman.

    Had you seen him doing anything before you pulled up?

A.  Yes.

Q.  What did you see him doing?

A.  He just approached me from the back.

Q.  So you took a picture of him because he walked down the street towards your back?

A.  Yeah.

(Video played.)

       BY MR. MCDANIEL:

Q.  And there, you were just taking photos of Mr. Simpson; is that right?

A.  Yes.

Q.  Now, why were you taking pictures of Mr. Simpson?

A.  I had observed Mr. Simpson hold an alcoholic bottle.  So I was taking photos.

Q.  Okay.  So you agree with me, sir, that during the entire interaction with Mr. Simpson, up and until the time that you actually place him in handcuffs, you never say to Mr. Simpson that you saw him drinking any alcohol?

    You never said that; right?

A.  That is correct.

Q.  Neither did you say that to any of the officers who you

were driving with when you got out of the vehicle.  So before you got out of the vehicle, you never said to anybody "I saw him drinking a bottle of alcohol"; correct?

A.    I never saw him drinking.

Q.    Or holding.  You never said anything about a bottle of alcohol -- drinking, holding, near -- before you got out of the vehicle; correct?

A.    Correct.

Q.    And the entire time you were actually standing there taking pictures of individuals, you never said anything to Mr. Simpson or anyone else about having seen him in possession of what you thought to be an open container of alcohol; correct?

A.    Based on my training and experience, I don't think that was a tactical way to approach the situation.

Q.    That's fine.  But you agree with me that you never said anything to anyone on the scene, including Mr. Simpson, that you saw him with an open bottle of what you believe to be alcohol; correct?

MR. HELFAND:  Objection; asked and answered.

THE COURT:  Overruled.

BY MR. MCDANIEL:

Q.    Is that correct?

A.    Correct.

Q.    And even in the interaction and before you stand Mr. Simpson up and begin to pat him down, you still have not

said anything to anyone about having seen him with what you believe to be an open container of alcohol; correct?

A.    I believe at that point when he stood up, we had already observed the mylar bag that he showed us with the marijuana.  So at that point, we had already established something else.

Q.    Sure.  So let me ask the question again.  I want you to listen to my question.

Up to that point when you are standing Mr. Simpson up and placing him in handcuffs, you never said anything to anyone about having seen him with an open bottle or open container of alcohol; correct?

A.    Correct.

(Video played.)

BY MR. MCDANIEL:

Q.    So when you asked Mr. Simpson about the marijuana, what you believed to be marijuana in the bag, you asked him how much he had; correct?

A.    Correct.

Q.    And then he pulled the entire bag out; is that right?

A.    Correct.

(Video played.)

BY MR. MCDANIEL:

Q.    So the first place that you actually reach, based upon what we see here, is near the crotch area of Mr. Simpson; is that right?

A.    The waist area.

Q.    You believe that to have been the waist area?

      I'm going to let you see it again.

      (Video played.)

            BY MR. MCDANIEL:

Q.    It's your testimony, Officer, that the area that you reached and grabbed was his waist area; is that right?

A.    Yes.

      (Video played.)

            BY MR. MCDANIEL:

Q.    When Mr. Simpson showed you the marijuana, you didn't know how much marijuana was in the bag; correct?

A.    Correct.

Q.    And you also are aware that it's legal, at least in the District of Columbia, under D.C. law, to possess approximately two ounces of marijuana?

A.    Two ounces.

      (Video played.)

            BY MR. MCDANIEL:

Q.    Now, in your police report, if you recall, your representation even there was that you actually patted Mr. Simpson down at his waist area.

      Do you recall that?

A.    I'll have to read my report.

Q.    Sir, have you seen the *Gerstein* report in this case?

A.   At some point, I have, yes.

MR. MCDANIEL:  Court's brief indulgence.  I apologize.

Your Honor, with the government's permission, I would like to mark this as Defense Exhibit Number 2.  I think the video was 1, from my recollection.

THE COURT:  Any objection?

MR. HELFAND:  No, Your Honor.

THE COURT:  Very well.

BY MR. MCDANIEL:

Q.   I'm approaching with the *Gerstein*.  I will give you a chance to review that, and let me know when you've had an opportunity to review it.

A.   Okay.

Q.   Having read the *Gerstein*, in essence the police report, the representation, at least in the report, was that after you had gotten out of the vehicle and upon approaching Mr. Simpson after you got out of the vehicle, that you clearly observed Mr. Simpson in possession of a small sweet red Sutter Home wine bottle.

Do you remember seeing that?

A.   I just read that, yeah.

Q.   Right.  That wasn't accurate; correct?

In the report, that's not accurate, that as you approached him you saw him in possession of the bottle?

A.   As I was driving towards the crowd?

Q.    Right.  This is different.  This is when you are out of the vehicle and walking towards him.  The representation here in the *Gerstein* is that when you're walking towards him, you can actually see him with the bottle.

Do you agree or disagree?

A.    Is that what it says, that I was walking?

Q.    Let me read this, and let me know if you agree.

"Officers exited their police cruiser to investigate further."  Let me read the whole thing.

"At approximately 2224 hours, officers were traveling westbound in the 1400 block of Saratoga Avenue Northeast when they observed a group of individuals congregating on the south sidewalk in front of 1427 Saratoga Avenue Northeast.

"Officers observed a male, later identified as Antwain Simpson, a black male with a date of birth of 7/18/1980, who was identified on the scene by his Maryland driver's license, who will now be referred to as defendant Simpson.  He was sitting in a lawn chair in possession of what officers recognized to be a personal Sutter Home wine bottle.  Officers exited their police cruiser to investigate further.

"Upon approaching defendant Simpson, Officer Sibrian clearly observed defendant Simpson in possession of a small sweet red Sutter Home wine bottle.  The small wine bottle was nearly empty, with a small amount of red liquid visible inside.  Upon retrieving the wine bottle, Officer Sibrian detected the

smell of an alcoholic beverage emanating from it."

So having had me read that to you, you agree that this is not correct; right?

So in other words, after you got out of the vehicle, you never -- as you were approaching him, never saw him in possession of this red Sutter Home bottle?

A.    That is correct.

Q.    And it's true also, sir, that nowhere in this document did you or any other law enforcement officer represent that the probable cause for the search of Mr. Simpson was because of the marijuana that he was in possession of; is that fair to say?

And if you want to see it again, I'm glad to show it to you.

A.    Yeah; yes, please.

MR. MCDANIEL:  I'm sorry, Your Honor.  I approached without asking.

THE COURT:  Very well.

THE WITNESS:  Can you repeat the question?

BY MR. MCDANIEL:

Q.    Having reviewed this document, Defense Exhibit Number 2 for the motion, you agree that based upon your review, there is no assertion in the document, the police report, that the basis of the probable cause that was relied upon for the pat-down search of Mr. Simpson was the marijuana that he was in possession of?

A.    Yes.  I think based on the report, yeah, the observations

were not clearly stated about the marijuana.

Q.   So you agree with me, then, that there's no representation in this document that the probable cause was provided based upon the marijuana that he was in possession of; correct?

A.   Correct.

MR. MCDANIEL:  If I can have the Court's brief indulgence.

Thank you, Your Honor.  No further questions.

THE COURT:  Redirect?

MR. HELFAND:  Yes, Your Honor.

REDIRECT EXAMINATION

BY MR. HELFAND:

Q.   I would like to ask you about the *Gerstein* affidavit that you were just shown.

Did you author that document?

A.   No.

Q.   Who wrote it?

A.   Officer Malik Harleston, now a detective.

Q.   Turning to your testimony before the grand jury, were you ever asked, when you came before the grand jury, based on your memory, if you arrested Mr. Simpson based on your observations about marijuana or other illegal narcotics, if you recall?

Perhaps let me phrase the question differently.

Is it correct you were not asked about --

MR. MCDANIEL:  Objection, Your Honor, to leading.

THE COURT:  Sustained.

MR. HELFAND:  I will rephrase the question.

BY MR. HELFAND:

Q.   If you recall, were you asked if you arrested him based on your observations about marijuana?

A.   Based on what I just read, I don't think that question was asked.

Q.   Does body-worn camera capture everything that you can see with your eyes?

A.   No.

Q.   So it captures other things that are going on that you are able to -- why is that?  Let me ask it that way.

A.   Based on MPD policy, the body-worn camera needs to be attached to the vest -- actually, in front of the chest area on the vest.  I can move my head left and right, up and down.  My BWC wouldn't be able to capture what I can see with my eyes. It's just going to capture what is in front of the chest area.

Q.   Now, on cross-examination, you were asked about that period of time, the minute or so, when you were -- when you approached Mr. Simpson but you didn't initially talk with him.

Why did you just approach him but not engage him?

A.   Based on my training and experience working for a little over eight years for the police department and based on my previous interactions in the 1800 block of Saratoga Avenue Northeast, I didn't think it was a tactical approach to just

approach this individual by myself when there is other individuals, at least one more, approaching me from the back and other individuals around and not having backup before I even approach or say what I observe.

Q.   Did you wait until another MPD officer was with you before engaging with Mr. Simpson?

A.   I waited until my partner, the officer that I work with and I feel comfortable working with, as I have trained with him, came next to me, and that's when we approached.

Q.   Prior to testifying, you had an opportunity to review portions of Officer Harleston's body-worn camera; is that right?

A.   Correct.

Q.   And would you recognize images from his body-worn camera if you saw them again?

A.   I think so.

Q.   There are three images that I would like to show you, Officer, and we will mark those for identification purposes as Government Exhibits 4, 5, and 6.

Exhibit 4 should be on the screen in front of you now.  Do you recognize this image?

A.   Yes.

Q.   And is it from Officer Harleston's body-worn camera?

A.   Yes.

Q.   I'm just going to move forward to Exhibit 5.

Do you also recognize Exhibit 5?

A.    Yes.

Q.    Is it also from Officer Harleston's BWC?

A.    Yes.

Q.    And finally, Exhibit 6, do you also recognize this?

A.    Yes.

Q.    Also from Officer Harleston's BWC?

A.    Yes.

Q.    And do these three images that I've just shown you, Exhibits 4, 5, and 6, do they fairly and accurately depict still images from Officer Harleston's body-worn camera from August 22nd of 2025?

A.    Yes.

        MR. HELFAND:  Move for the admission of these three exhibits, Your Honor, into evidence.

        THE COURT:  Any objection?

        MR. MCDANIEL:  No objection.

        THE COURT:  Admitted.

    (Government Exhibits 4, 5, and 6 received into evidence.)

        BY MR. HELFAND:

Q.    I'm going to take us back to Exhibit 4.

    Are you able to see on the screen here in Exhibit 4 -- and I'm going to try to make it a little bigger.  Zooming in, can you see on the screen here the bottle of alcohol that you observed Mr. Simpson holding when you first arrived in this location of Saratoga Avenue earlier in the evening?

A.   Yes.

Q.   And I would just ask -- I know the last time we were in front of Your Honor, the drawing function on the screen was not working.  Is it functional now?  Okay.

So, Officer Sibrian, you should be able to touch the screen and draw.  I ask you to draw a circle around the bottle where you see it.

A.   (Witness complied.)

BY MR. HELFAND:

Q.   For the record, you've drawn an orange circle around an object at the bottom middle of the screen; is that correct?

A.   Correct.

Q.   I'm going to clear the drawing and take us now to Government Exhibit 5.

Looking at Government Exhibit 5 -- and I'll make this a little bit bigger as well -- can you see that alcoholic beverage or the bottle of alcohol that you initially observed Mr. Simpson holding when you first arrived in this location?

A.   Yes.

Q.   Can you circle that as well?

A.   (Witness complied.)

Q.   And for the record, you've drawn an orange circle around what appears to be a small bottle in the bottom center of Government Exhibit 5; is that correct?

A.   Yes.

Q.    Finally, taking us to Government Exhibit 6, which I will also make a little bit bigger for us, can you identify where that beverage or bottle of alcohol is located?

A.    Yes.

Q.    Please circle it.

A.    (Witness complied.)

Q.    And for the record, you've drawn a circle around a small glass bottle in the bottom center of Government Exhibit 6; is that right?

A.    Yes.

Q.    Finally, on cross-examination, you were asked about several pending investigations that you have; is that correct?

A.    Correct.

Q.    And I believe the last time you were testifying, you were asked about a use-of-force investigation that had been opened the day before you started testifying; is that right?

A.    Correct.

Q.    And is it standard that whenever there's a use of force, the Metropolitan Police Department will conduct an investigation into the use of force?

A.    Yes.

Q.    You were also asked about several pending investigations; is that right?

A.    Correct.

Q.    And several of those were pending investigations with the

Office of Police Complaints; is that correct?

A.   Correct.

Q.   And you don't -- or at least when you were asked about them, you didn't know the disposition of those investigations because they were pending?

A.   Those allegations are still pending investigation.

Q.   And is it correct that anyone can file a complaint with the Office of Police Complaints?

A.   I think the Office of Police Complaint does a pretty good job taking any kind of allegation, even when the officers were not even involved but they're actually on the scene.  So if there's a five group of different officers on the scene, even though you didn't do anything wrong, you were not a part of the actual scene, but the fact that you were there or did the transport, you're a part of those investigations.

So that's what I was saying the other day.  These are allegations that are still open, and there's no status yet.

MR. HELFAND:  So brief indulgence, Your Honor.

THE COURT:  Yes.

BY MR. HELFAND:

Q.   Officer Simpson, you recovered the -- or I should say, you picked up -- let me rephrase the question so I'm not leading.

Did you pick up the red bottle of alcoholic beverage that you observed when you were on scene back in August?

A.   Yes.

Q.   Would you recognize a photograph of it if you saw it again?

A.   Yes.

Q.   Showing you what's been marked for identification purposes as Government Exhibit 9.

Do you recognize Government Exhibit 9?

A.   Yes.

Q.   What is it?

A.   That's the bottle that I recovered from the bottom of the lawn chair.

Q.   And does this image, Government Exhibit 9, fairly and accurately depict the photograph you took of the bottle you recovered from the lawn chair?

A.   Yes.

MR. HELFAND:  We would move for the admission of Government Exhibit 9 into evidence.

MR. MCDANIEL:  No objection.

THE COURT:  Admitted.

(Government Exhibit 9 received into evidence.)

BY MR. HELFAND:

Q.   When you recovered the bottle that's depicted in Government Exhibit 9, was there any liquid inside of it still?

A.   There was residue.

Q.   And did you smell it?

A.   Yes.

Q.   What did it smell like?

A.   An alcoholic beverage.

MR. HELFAND:  Thank you, Your Honor.  I have no further questions.

THE COURT:  Okay.  Thank you.

Any other witnesses?

MR. HELFAND:  No, Your Honor.

THE COURT:  Any witnesses from the defense?

MR. MCDANIEL:  No, Your Honor.

THE COURT:  Okay.  I will hear argument from government counsel.

MR. HELFAND:  Your Honor, as set forth in our pleading, we submit that there was probable cause for law enforcement to arrest Mr. Simpson when officer -- after Officer Sibrian had observed Mr. Simpson holding what appeared to be an alcoholic beverage, which later wound up being or was determined to be this bottle of Sutter Home wine that he placed -- that he was holding in his hands and that he placed at the bottom left side of his chair when the officers arrived.

THE COURT:  Is it correct that the defendant was not told immediately upon being approached by the officers that he was being arrested for having allegedly been in possession of an open bottle of alcohol?

MR. HELFAND:  That is my understanding, Your Honor. The police did not tell him that that's why he was being arrested.

THE COURT:  How do I consider that?  If in fact I'm being asked to credit that they in fact were -- or at least this officer in fact made that observation, how do I consider the fact that he was not immediately told that that was the basis for him being arrested?

MR. HELFAND:  We submit, Your Honor -- my recollection from the officer's testimony, if I recall correctly, was that he had -- when asked why he didn't initially tell Mr. Simpson that he was being arrested but, rather, just said "you're being placed in handcuffs and you're just being detained" was in order to keep Mr. Simpson calm at the time of the arrest.

The officer explained that that's a tactic that the officers will use in order to prevent an altercation from occurring when they're initially placing someone in handcuffs.

THE COURT:  But that doesn't have anything to do with him being told the basis for what was occurring, and he was told he was not being arrested, he was only being detained.

But can you detain somebody by handcuffing them if you don't have a basis for arresting them at the time?

MR. HELFAND:  I would submit, Your Honor, that at that point, the officer did in fact believe that he had probable cause to arrest Mr. Simpson at that time.  And he in fact testified as much during grand jury.

THE COURT:  I guess what I'm struggling with is, why would telling him that he was under arrest for having been in

possession of an open bottle of alcohol, why would that have created more of a potential ruckus or whatever as compared to having him stand up and placing him in handcuffs?

It seems to me that that would have, you know, enraged the community to a greater extent than telling him that he was under arrest for having had an open container of alcohol.

I guess I'm struggling with why it was felt that what he did would have not caused the same concern that he had in reference to telling him it was because of an open container of alcohol.  It just seems to me, if he was legitimately concerned that because there were so many people out there, that somehow that would create a hazardous situation for the officers, why wouldn't what he did have caused that same concern?

MR. HELFAND:  I think in perhaps -- I'm not sure if I elicited this from him on direct examination, and perhaps we could recall the officer and I could pose this specific question to him.  But I believe he would say that the reason that it was articulated as such had to do with the fact that they didn't want Mr. Simpson to fight them when they were placing him in handcuffs.

If I didn't elicit that from the officer, I certainly would seek the opportunity to recall the witness to ask him that question.  But I believe that -- if I didn't elicit that from him on direct examination --

THE COURT:  So he was -- the sequence is that he was

placed in handcuffs before his satchel was searched; right?

MR. HELFAND:  That's correct.  My understanding in terms of the sequence of events, Your Honor, is the officer arrived in his vehicle, and as he's driving in this location, he looks out the window, and that's when he sees Mr. Simpson holding the bottle of alcohol.

And I do recall him testifying on direct examination that before the officer even had stepped out of his police cruiser, Mr. Simpson placed that Sutter Home wine bottle down on the left-hand side of the chair where he was seated, which was visible in those still images, Government Exhibits 4, 5, and 6, from when Officer Harleston was approaching Mr. Simpson along with Officer Sibrian.

And as the video depicted, it was when Officer Harleston arrived, that's when Officer Sibrian approached Mr. Simpson and was able to observe that mylar bag partially sticking out of the satchel.  That's when Officer Simpson -- Sibrian, excuse me, asked Mr. Simpson:  "How much weed do you have in the bag?"  And Mr. Simpson -- I believe he said:  "Not much."  Officer Sibrian asked Mr. Simpson:  "Can you fold up the bag?"

And instead of folding up the bag, Mr. Simpson opened the satchel and removed the white mylar bag.  Officers were able to see inside of the bag.

And that's when Officer Sibrian and Officer Simpson approached Mr. Simpson, asked him to stand up, told him "you're

not being placed under arrest, you're just being detained right now," and placed him in handcuffs and then did a protective pat-down of Mr. Simpson.

THE COURT:  Right.  Again, I'm just struggling with how I credit what he says if in fact he's saying that he had probable cause to arrest the defendant because he was seen consuming an open container of alcohol; why he didn't -- when he initially approached him, why he just didn't say "you're under arrest for possessing and consuming alcohol."

If he had probable cause -- and that's what he says, that he had probable cause to arrest him for it -- why didn't he arrest him for that at that point?

MR. HELFAND:  To the extent I did not elicit that specific question, I would ask for the opportunity to recall the officer, and we can pose that question to him.  Of course, Mr. McDaniel could have the opportunity to cross-examine him on that.

I would submit that the additional evidence -- one note, Your Honor:  I believe Officer Sibrian testified he observed Mr. Simpson in possession of the bottle but never drinking it. And I believe Your Honor said "consuming."

THE COURT:  Either way.  And he says -- in the *Gerstein*, it says he was arrested for having an open container of alcohol.

MR. HELFAND:  Right.  But I would submit, too, that

the still images and the body-worn camera that we presented to the Court, which I can certainly put back up, do provide additional -- an additional basis for this Court to credit Officer Sibrian's testimony, particularly given where the location of the bottle of alcohol was.

When officers arrived, it was consistent with how Officer Sibrian testified -- the location is consistent with how Officer Sibrian testified when he arrived in the 1600 block of --

THE COURT:  Based upon the testimony, it would seem that the reason he arrested the defendant was because of the marijuana and not the alcohol.

MR. HELFAND:  I would submit, Your Honor, that the officers had both bases to arrest him.  I think it's significant that the officer did immediately go and recover this bottle of alcohol that he had observed him holding.

And when Mr. Simpson was ultimately charged, he was placed under arrest for both drug-related offenses and this bottle, the possession of an open container of alcohol, as well.

THE COURT:  Okay.  Anything else?

MR. HELFAND:  Brief indulgence, Your Honor.

THE COURT:  And I'm familiar with it because it was my case at the trial level, and the Court of Appeals said I got it wrong in the *Gamble* case.  It seems to be very similar to what we're dealing with here, in that at the point -- at what point

was he seized, and it seems to me he was clearly seized at a point prior to the marijuana having actually been discovered. So the seizure would have had to have been -- to be legal, would have had to have been based upon the alcohol.

MR. HELFAND:  So we would submit, Your Honor, that the officers, because they observed him with this -- as I indicated, with the open container of alcohol, they had a lawful basis to arrest him.  It also gave them a lawful basis to approach him and engage with him further.

And it was during that time, after Officer Sibrian had approached the officer -- excuse me, after Officer Sibrian had approached Mr. Simpson, having observed him in possession of an open container of alcohol and was speaking with Mr. Simpson -- well --

THE COURT:  Again, that's what I'm struggling with. If he in fact believed he had probable cause to arrest him for the open container of alcohol, why didn't he say that when he approached him and placed him under arrest at that point?

MR. HELFAND:  I would note just with regard to the point about the marijuana, Your Honor, that the officer did observe Mr. Simpson's satchel with, as he testified, that white bag sticking out.

And as we indicated in our filing, ECF Number 38, we argued that the officer had a basis -- having observed this white mylar bag partially sticking out of the satchel, that the officer,

based on his training and experience, knew or it's consistent with being used to store --

THE COURT:  But he didn't arrest him immediately at that point.

MR. HELFAND:  He continued to --

THE COURT:  He saw the mylar bag.  It wasn't after until they went into his bag and found what they found that he was arrested.  He wasn't arrested just based upon the initial observations of the mylar bag inside of the satchel.

MR. HELFAND:  That's correct, Your Honor.  But we submit that that gave the officer a basis to conduct a *Terry* stop and engage in additional investigation.  So while it's true that he wasn't immediately placed under arrest, we submit that that observation, combined with the officer's training and experience, gave him a reasonable basis to continue to engage with Mr. Simpson.

THE COURT:  What is a mylar bag?  I don't even know what it is.  I saw what it is, but that didn't really indicate to me.  What exactly is it?  Does it hold things other than drugs?  I assume it does.  I assume it's a type of bag that holds food items, too; right?

MR. HELFAND:  I'm putting on the screen, Your Honor, Government Exhibit 13, which has an image of the plastic mylar bag that officers recovered from Mr. Simpson's bag.

And as you can see, it's a plastic bag.

THE COURT:  It has a legitimate commercial use?

MR. HELFAND:  That may be so, Your Honor.  I believe the officer testified based on his training and experience that these bags are consistently used to hold marijuana.

THE COURT:  That may be true, but it also legitimately would hold other items, too, and query, with merely seeing somebody with a bag protruding from a satchel that they have, would that be enough for them to have probable cause or at least reasonable suspicion to believe that a crime is being committed, i.e. possession of drugs?

MR. HELFAND:  I do believe, if I recall correctly, Your Honor, the officer did testify about a prior gun and drug recoveries in this area as well.  So we submit that that -- it's the totality of the circumstances here -- the prior drug recovery, prior gun recovery, and his observations -- that gave him a basis to continue to engage with Mr. Simpson after he observed this white mylar bag with the top zipper sticking out of the satchel, as he testified.

THE COURT:  Okay.  Unless you have something else, I will hear from counsel and let you respond to him.

MR. HELFAND:  And I would ask, Your Honor, for the opportunity -- given that the officer, I believe, is outside, if we could recall him for the purpose of asking the specific question that Your Honor has raised.  I think to the extent I did not elicit that on direct examination, I think that is

probative to the Court's analysis of the officer's credibility.

MR. MCDANIEL:  Yes, Your Honor.  We would object to recalling the witness for that purpose.

He actually spoke to that in his testimony.  He said that the reason that he didn't mention anything to Mr. Simpson about stopping him or approaching him because he had previously seen him with this open container of alcohol was because he didn't want to alarm him or the other individuals who were around him and cause a disturbance.

I just don't credit his testimony at any level.  The witness, his demeanor, even the way that he answered or didn't answer questions, both today and during his previous testimony, I think, speaks to his commitment to veracity.

And this is what we are really talking about here, whether or not we can credit this officer as having seen what it is that he alleged he saw on that day, which formed ostensibly the basis for the probable cause, which he cites at every turn.

At the grand jury, the only mention of probable cause is for his observation of the open container of alcohol.  In the police paperwork, the only representation related to the establishment of probable cause is for the open container of alcohol.

And as this Court has highlighted, when he gets out of the vehicle -- not at the time that he's standing in front of Mr. Simpson shining the light on him and others, not at that

point does he say "I saw you with an open container of alcohol." When Mr. Simpson asked him the question why he's being detained, he doesn't say anything about an open bottle of alcohol.

And I submit, Your Honor, that it's the opposite, right, that would lead to some additional fracas, if you will.  If you are arresting someone and you provide them the reason for the arrest, okay, well, they may disagree with you, but at least they have some reason.

But not to provide any reason at all, I think, is more likely to cause some concern on the part of Mr. Simpson or the individuals who are around, because now they're witnessing an arrest, the likes of which they don't know why is occurring.

But I think there's even more than that, Your Honor, that this Court can look to in order to determine that Officer Sibrian was just not telling the truth about having seen what it is that he alleged he saw, in that it is a pretextual post hoc justification for the search.

If he's in the vehicle, Your Honor, and he sees what he alleges he saw as he's driving down the street, which is his testimony, he doesn't even say anything in the car, before he's outside in amongst the public, where his statement might cause some concern on the part of those individuals who hear him.

When he's in the car and before he gets out, he acknowledges here that he never said anything even out loud to the other officers who he was with, and it would be simple to

do.

I would imagine if you're riding down the street with your colleagues in the car and part of the reason for your stop is because you see somebody drinking an open container of alcohol, you might say to your partner who is sitting next to you "I just saw him with a bottle of alcohol," or something to suggest that you've seen what it is that you allege you saw.

But everyone here in the courthouse knows that they were going there anyway. They didn't receive a call. There was no other reason for them to be there. There were a number of different agencies. When he testified before, he acknowledged that there was some joint task effort just to jump out in the block. That's what they did.

And so it wasn't as if he were riding down the street and he saw something that led to him stopping his vehicle. They had already planned to go out and jump out on these people and take pictures of them for no apparent reason, for just being in the block.

And so if that's the case, Your Honor, we should have questions about whether or not -- I think that's more support for the contention that he goes into the block. He encounters Mr. Simpson, who he may have thought was armed. He may have thought that. And he was looking for some reason to further interact with Mr. Simpson, but he was seized at the time that Mister -- Officer Sibrian was standing in front of him. He was

sitting down in the chair.  There was no reasonable expectation on the part of Mr. Simpson that he would have been able to just stand up and walk away.  He was seized.

And the only basis that the government could be relying upon at this point for the initial seizure is this open bottle of alcohol.

So what does the pretext look like?  So he engages with Mr. Simpson.  There's a frisk and an arrest that results in the recovery of the firearm.  And then it's only after that, Your Honor, that the bottle makes its first appearance in this case at all or anybody says anything about the bottle.

And that's what post hoc pretext would be.  He would say okay, well, there's a bottle there.  Nobody can disprove that I didn't see -- nobody can disprove that I saw him in possession of this bottle, and that would be support for the stop and frisk of him, except that there's nothing that he does, nothing that he does at any point in time that suggests that that's what he saw.

THE COURT:  What about the observation of the mylar bag inside of his satchel?  Does that provide articulable suspicion to believe that a crime is being committed?

MR. MCDANIEL:  It doesn't, Your Honor.  It's just at that point a bag.  But as the Court has already noted, he's already been seized by the time that they start having any conversation about the bag that, as the Court has noted, could

be for some illegal substance; it could be for something legal.

And so at that point in time, the constitutional violation has already occurred.

THE COURT:  Okay.

MR. MCDANIEL:  And so -- I'd ask the Court, to whatever extent it matters, to take note of -- and we instruct jurors to do this, too, to observe the manner of testimony from witnesses.  And the fact that he has pending investigations is not the end of Officer Sibrian's record as it relates to community complaints.  He has those other allegations and complaints that were sustained, the likes of which I had a great deal of trouble getting him to admit as well.

So we would ask the Court not credit his testimony, find that the government has failed to establish its burden as it relates to the establishment of probable cause in this case, and we would ask that the evidence be suppressed.

THE COURT:  Having raised the concerns that I raised, I don't think it would be appropriate to permit him to be called to present additional testimony.  Obviously, I like to decide cases based upon all of the available evidence, but I don't think I should give a tactical advantage to one side, having expressed concerns I have about maybe what the evidence has shown.

But any rebuttal?

MR. HELFAND:  Yes, Your Honor.

First, I do think a review of the transcript -- I will rephrase that.

One point that I would like to respond to is Your Honor did ask about whether or not someone could be placed in handcuffs without being arrested.  We did cite on page 16 of ECF Number 38 case law that does support the proposition that law enforcement may handcuff a detainee if it's reasonably necessary for the safety of officers or others prior to placing him under arrest.

I just did want to respond to the Court's point with regard to that.

But I think returning to --

THE COURT:  Did that case involve a number of police officers?

As I recall, that was a lone police officer on the street with an individual, as compared to what we have here where there were a number of officers present.

MR. HELFAND:  That is a fair distinction, Your Honor.

Returning to whether or not this Court should credit Officer Sibrian's testimony, we submit that the Court should submit -- or should credit his testimony.

And with regard to Mr. McDaniel's point about why the officers were in this area, Officer Sibrian testified about why the police were there.  He was quite specific.  He testified that -- I'm reading from the transcript, from his prior testimony.

On page 6, starting at line 5, he said:  "This is a violent-crime area.  I've responded to numerous calls for service.  I've also participated in multiple arrests, as well as longer-term investigations in this area."

On page 7, he testified that he had been involved in multiple illegal narcotic transaction investigations, as well as illegal narcotic arrests and recoveries in the 1400 block of Saratoga Avenue.  He also indicated that he had been involved in 25 arrests and recoveries of narcotics in the 1400 block of Saratoga Avenue.

So this explains why the police were there.  There's a reason that they were driving through this neighborhood, given that it's a higher crime area.

Officer Sibrian also testified that he's a part of the Crime Suppression Team, and their job is to drive around in neighborhoods that are experiencing higher volumes of crime in order to attempt to suppress that crime.

And we submit the Court should credit Officer Sibrian's testimony, based both on what he testified on the stand, but also what the body-worn camera and the photographs that we've admitted into evidence depict.

Officer Sibrian testified -- he described what he saw when he was in his vehicle.  He described -- and I'll slow down for the court reporter, and I apologize.

He described seeing a bottle with what he believed to be a

pinkish cap from the inside of his car, and he testified that as he was driving in the block, he observed Mr. Simpson place that bottle on the left side of the chair where Mr. Simpson was seated.

And we dispute Mr. McDaniel's characterization that the bottle only first is visible or appears after the officers have begun interacting with Mr. Simpson.  And I would like to actually pull up a portion of the body-worn camera and play that for the Court.  It's associated with those three exhibits, those photographs I just showed, that demonstrate that the bottle is visible before the officers start talking to Mr. Simpson.  At a very minimum, it's visible when they first begin to engage with him.

I'm displaying on the screen what has been admitted into evidence as Government Exhibit 2, and I'm playing from time stamp 22:03:29 in the upper right-hand corner.

(Video played.)

MR. HELFAND:  I'm pausing at 22:03:38.

As Your Honor can see, the bottle is visible right underneath the left-hand side of the chair where Mr. Simpson is seated.  I will circle it, and I can also put up those three images that I showed Officer Sibrian.

So we submit, Your Honor, that it's correct that Officer Sibrian did not tell Mr. Simpson why he was being arrested, and I believe as Mr. McDaniel indicated, Officer Sibrian testified

it's because he didn't want to alarm or upset Mr. Simpson when they were initially putting him in handcuffs.  I imagine it was because for officer safety, they were worried that Mr. Simpson might try and fight with them if they told him they were arresting him as opposed to just detaining him initially.

But this is before they started engaging with him, and that bottle that Officer Sibrian described which he recovered is clearly visible on the screen.

So we submit, Your Honor, that the Court should credit his testimony based on the visual evidence, both these -- the body-worn camera and still images that we've introduced that Officer Sibrian did in fact observe what he testified to observing, and that provided him with a lawful basis to place Mr. Simpson under arrest and ultimately recover the firearm that was in Mr. Simpson's pants.

And it also, we submit, gave police a basis, as we were discussing, to approach Mr. Simpson, to begin to engage with him.  That's why Officer Sibrian ultimately saw that white mylar bag that was sticking out of the satchel.  And we submit, as a secondary argument, that police did have a lawful basis to at least engage with Mr. Simpson further to investigate whether or not that white mylar satchel did in fact contain illegal narcotics or not and whether it contained an amount of marijuana that was over two ounces.

And I would have to look at the transcript again, but I

believe that Officer Sibrian testified about his observations of the satchel -- excuse me, of the white mylar bag while it was still inside of Mr. Sibrian's satchel, and whether or not -- and how much marijuana it could potentially contain.

I don't recall exactly what he testified to off the top of my head right now.  So I don't want to misspeak as to his testimony.  But I do think that based on what he said, that may have provided an additional basis for police to continue to investigate and ask Mr. Simpson further questions.

But ultimately, we submit the Court doesn't have to reach that issue.  The Court can credit Officer Sibrian based on his testimony and what's visible in the video exhibits and images we've submitted to the Court.

And I do think it's relevant, too, that when Officer Sibrian steps out of his police vehicle, as demonstrated on his body-worn camera, he immediately starts walking towards Mr. Simpson.  And as he testified, he didn't engage with Mr. Simpson immediately, because he was the only MPD officer who was near Mr. Simpson.  He was outnumbered.  There were a lot of other members of the community who were there.

There was one other federal law enforcement officer who was near Mr. Simpson with Officer Sibrian.  But as Officer Sibrian testified previously and today, he was not comfortable working with that person.  So he waited until his partner arrived before they approached Mr. Simpson to begin to engage with him.

But I do think it is relevant that Officer Sibrian immediately walked over to Mr. Simpson.  It wasn't as if he was just perusing through the crowd and eventually made his way there.  He walked to Mr. Simpson immediately, which I think credits his -- provides a basis for this Court to further credit his testimony about what he observed.

THE COURT:  Okay.  Thank you.  I will take a short break.

(Recess taken from 3:15 p.m. to 3:33 p.m.)

THE COURT:  I think it's a close case, but the *Gamble* case, which as I indicated was my case at the trial level, is informative and, it seems to me, consistent with *Gamble* when the officer makes the demand or at least asks the question about how much marijuana do you have.  I think that, coupled with all of the surrounding circumstances -- you have a number of police officers present.  You have attention being directed at the defendant.  You've got a flashlight being shined at him.  I think a reasonable person would assume that they have to respond to that question to try and exonerate themselves in reference to what they have in their possession.

So consistent with *Gamble*, I think there has to be enough, when that statement is made by the officer, to give the officer articulable suspicion that a crime is being committed.

And the concern I have in reference to that is that despite the officer's testimony about these mylar bags, these type of

bags do in fact legitimately hold commercial products because of the nature of the bag and the fact that they can preserve food, and that's the primary purpose for which the bags are commercially used.

And I find it hard to conclude that that being the case, if merely because somebody has a mylar bag in a satchel that they're holding, that that gives the officer a reason to believe that they're committing a crime, even if that is taking place in a community or a neighborhood which is a high-crime/high-drug area.

Otherwise, I'd have to be concluding that anybody in the area of that nature -- and there's good people who live in areas like that -- if they have a mylar bag protruding from a bag that they have, that that's a reason to believe that they are committing a crime. And I think that's problematic for me to reach that conclusion, which means that I would have to be able to find that I credit the officer's testimony regarding the alleged observations of the defendant with an open container of alcohol.

And the difficulty I'm having there is what I expressed earlier, and that is, if in fact the officer saw him with an open container and therefore felt that he had reason to arrest him, which is what is in the *Gerstein*, then why -- when he approaches the defendant, why, if he felt he had probable cause at that point to arrest him, why didn't he tell him "you're

under arrest for an open container" and then proceed with whatever he did, find the drugs and the gun as a search incident to a lawful arrest.

But that didn't occur.  So I'm again having difficulty concluding that the officer in fact did believe he had probable cause to arrest him for the open container, in light of the fact that he did not tell him that that's why he was being arrested when he initially approached him, and it wasn't until after he saw this mylar bag and what occurred thereafter that ultimately resulted in the defendant being arrested and then the gun being found in a search incident to the arrest.

So under the circumstances, I think the *Gamble* case does in fact provide a basis for me to conclude that the seizure of the gun was a violation of the Fourth Amendment, and therefore, I would have to grant the defense motion to suppress.

I guess the government will have the opportunity to appeal if you want to, but under the circumstances, I think having reached the decision that I reached, I will order the defendant's release with -- I don't know how much time the government needs to have their Appellate Division assess whether they want to appeal the ruling.  I'll place conditions on him as far as his release is concerned in order for the government to have time to do that.  But I don't know what the government's position is in that regard.

MR. HELFAND:  Would Your Honor consider giving us the

opportunity to file -- a very short turnaround, but give us the opportunity to file some sort of supplemental briefing to address the officer's testimony further?

THE COURT:  I'm always ready to reconsider, but like I say, in light of the *Gamble* case, I just don't see how I reach a different conclusion if I can't conclude that I'm prepared to accept the testimony regarding the alcohol.

And since I have real concerns about that, I don't see how I'm going to be convinced to take a different position in that regard.  Because like I say, it just seems to me that if the officer believed that he saw what he saw and, therefore, had probable cause to arrest the defendant for the open container, that he would have arrested him immediately for having done that.

Not having done that just caused me to conclude that he did not feel he had probable cause at that point, and it wasn't until these other things took place that caused him to believe that he had a basis to arrest the defendant.

And like I say, I just am not prepared to conclude that seeing a mylar bag, which can be used for legitimate purposes, inside of a satchel in and of itself because of it being a high-crime area is indicative of the fact that he was committing a crime.

MR. HELFAND:  Your Honor, I guess one point we just wish to raise and redirect the Court's attention to is on

cross-examination, the officer was confronted with his sworn grand jury testimony.  And he was asked in grand jury, did you believe you had probable cause to arrest the defendant for possession of an open container of alcohol when they were putting him in handcuffs, and he said yes.

THE COURT:  But he didn't do that at the time.  What I'm talking about, at the time of his encounter with the defendant, he didn't at that point say, "You are under arrest for having an open container."

So that being the case, it is hard for me to conclude that somehow he did feel he had probable cause to arrest him for that, but yet, he didn't tell him he was being arrested for that at the time.

MR. HELFAND:  I would note, Your Honor, that the officer did testify under oath --

THE COURT:  He did not say at the time of the arrest -- he did not approach him and say, "Look, I saw you with an open container of alcohol.  You're under arrest."  He did not do that.

MR. HELFAND:  That's correct, Your Honor, and I asked him why when he testified on direct examination.

I asked him:  "What did you tell the defendant when you placed him in handcuffs?"

He answered:  "You're not being arrested.  You're being detained."

I said:  "Why did you tell him you're not under arrest, just being detained at that point?"

And the officer responded:  "I've been involved in multiple arrests and investigations in the 1400 block of Saratoga Avenue Northeast.  Every time we go to make a detention on arrest on this block, based on my experience, it's one of the most violent blocks against law enforcement."

THE COURT:  I don't doubt that that may be the case, but I don't -- I'm not convinced that what he did somehow diffused the potential of outrage by the community to a lesser degree.

I mean, why would what he did not have caused the same concern that he says was the case?  I just don't see -- if he had approached him and said "you're under arrest for an open container of alcohol," why would that have created more of a potential danger for the police officers as compared to what actually happened?

MR. HELFAND:  I can't testify for the officer.

THE COURT:  I understand.  But I just am not convinced that somehow he was protecting the officers from assault by what he did as compared to -- as to what he didn't do as compared to what he did.

MR. HELFAND:  I understand that, Your Honor.

I guess my --

THE COURT:  Well, maybe the Court of Appeals will see

it differently.

MR. HELFAND:  I would just ask one last time, Your Honor, if we could -- I have not had any conversation with this witness between before he took the stand and since.  Given that Your Honor is basing a credibility determination on this specific fact, I do think it would be appropriate for us to hear from the witness.

THE COURT:  I don't think it's -- I've already ruled on that.  I just don't think it's right for me to play my hand as to where I am and then to give the government the opportunity to come back and clean it up.

We're an adversarial system, and I'm supposed to be a neutral judge.  And I can't side with one side or the other.

MR. HELFAND:  I understand that, Your Honor.

THE COURT:  If you all want to appeal, you have the right to appeal.

How much time do you think you will need to talk to your Appellate Division to assess whether you want to appeal the ruling?

But I am going to release him with conditions.

MR. HELFAND:  I'm not sure, Your Honor, exactly how much time we would need.  I would ask for at least two weeks.

THE COURT:  Very well.  I will continue the matter for two weeks to give you the opportunity to do that.

But considering the ruling that I made, I think it would be

unfair for me to keep him detained any further.

Two weeks, I will be in Pittsburgh handling a matter up there.  So I can't do it two weeks from now.  I can do it on the 31st of March at 2:00.

Is that good for counsel?

MR. MCDANIEL:  That's fine, Your Honor.

THE COURT:  Very well.  I will order his release.

We may need to get somebody here from Pretrial.

COURTROOM DEPUTY:  Pretrial is coming up now, Your Honor.

THE COURT:  Let me know when they get here.  I will come back out.

(Recess taken from 3:43 p.m. to 3:53 p.m.)

THE COURT:  Okay.  Do we have somebody from Pretrial?

PRETRIAL SERVICES OFFICER:  Shania Fennell, Pretrial Services Agency.

THE COURT:  You have his history regarding him?

PRETRIAL SERVICES OFFICER:  Yes, I'm pulling it up, Your Honor.

THE COURT:  You can go ahead.

PRETRIAL SERVICES OFFICER:  Your Honor, do you know what conditions you're going to impose?

THE COURT:  Were you working, sir?

MR. MCDANIEL:  He was, Your Honor.  Our request was going to be --

THE COURT:  Where were you working?

THE DEFENDANT:  DPW, sir; Department of Public Works.

MR. MCDANIEL:  So our request --

THE COURT:  I don't know if that job will be available for you or not, but I will order that you obtain employment, if that's possible.

And I think I would be inclined -- it's been a while since he's been convicted.  The last conviction was in 2015, I think. But I think I would be inclined to place him under house arrest and not permit him to be away from the home unless he is at work or attending some legitimate obligation, like a medical appointment or something of that nature.

PRETRIAL SERVICES OFFICER:  So home detention?

THE COURT:  Yes.

So once you are released, you will need to report to the Pretrial Services Agency, and they will go over the conditions of your release.  And as I said, I will permit you to be released, but you're going to be on home detention.  If you're working, obviously, you can leave the house and go to work.  If you have medical appointments or some legitimate reason to be away from the home, you can do that.  But you'll need to let Pretrial know when you're going to be away, and you will have to notify them when you come back.

And we will continue this matter for you to come back.  By then, the government can decide whether or not they want to

appeal my decision to the Court of Appeals.

Thank you.

(Defendant sworn to abide by conditions of release.)

(Proceedings adjourned at 3:55 p.m.)

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

CERTIFICATE OF OFFICIAL COURT REPORTER

I, Sara A. Wick, certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

/s/ Sara A. Wick_____          March 18, 2026\_\_\_\_\_

SIGNATURE OF COURT REPORTER          DATE